THE STATE OF OHIO, APPELLEE, *v.* MILO, APPELLANT.

(No. 81AP-746—Decided September 30, 1982.)

Mr. Lynn C. Slaby, prosecuting attorney, Mr. Marc R. Wolff, Mr. Frederic L. Zuch and Ms. Annette L. Powers, for appellee.

Mr. George Pappas and Ms. Elizabeth Reilly, for appellant.

NORRIS, J. Defendant-appellant, Frederick P. Milo, appeals from his conviction in the Court of Common Pleas of Franklin County for the aggravated murder of his brother, Constantine D. (Dean) Milo. Defendant had entered pleas of not guilty and not guilty by reason of insanity.

Several co-defendants were permitted to plead guilty to the lesser included offense of conspiracy to commit aggravated murder in exchange for their cooperation and testimony against defendant. The state contended that defendant had procured and conspired with others to murder his brother.

Defendant was granted a change of venue to Franklin County as the result of extensive pretrial publicity in the Akron-Summit County area. Following a first trial where the jury was unable to agree upon a verdict, trial was recommenced on July 13, 1981.

At trial, testimony indicated that the Milo Beauty & Barber Supply Company was founded by defendant's father, Sotir Milo, and was operated as a family business. Under the direction of Dean Milo, the business expanded. By 1974, Dean began expressing a desire for more control.

Sotir Milo testified that it was his and his wife's intention that their three children, defendant, Dean, and Sophie, share equally in the business but that, as the result of pressure from Dean, in 1976 he signed a document which gave Dean control of the company.

By 1979, Dean Milo had relieved defendant of most of his duties; by June 1979, defendant and Sophie had been removed from the board of directors; and, in August 1979, defendant and Sophie were fired. By January 1980, Sotir Milo had also been removed from the board.

Anthony Ridle, a former employee of the Milo company, testified that, after termination of his employment, he moved to Arizona where he operated a night club near Phoenix called the Star Systems; that, in May or June 1980, he spoke by telephone with defendant who stated that he wanted Ridle to find a hit man to kill his brother, who was going to be in Phoenix; that he spoke with Harry Knott, a friend who was in business with him operating the night club, and Knott said that he could find someone and he relayed this information to defendant via Ray

Sessic, another one of the co-defendants; that he traveled to Cleveland to pick up money and a picture of Dean from defendant; that he gave the money to Knott, who, together with a hit man, trailed Dean while he was in Phoenix but had no opportunity to kill him prior to his return to Ohio; that hit men then went to Ohio at defendant's request; that Dean went to Florida and the hit men followed; that Sessic called him on approximately August 8 to say that Dean was returning to Akron, which information he relayed to Knott; that, on August 10, Knott called Ridle to say that the job was completed; and that he and defendant subsequently discussed defendant's paying for his brother's murder.

David Hardin testified that an acquaintance, John Harris, told him that he could make some money if he would kill Dean, and he agreed; that, on August 10, at approximately 12:30 or 1:00 a.m., he and Harris drove to Dean's residence; that he knocked on the door while holding a blank Western Union telegram form; that, when Dean answered, he told Dean he had a telegram for him and then told him to lie on the floor and shot him in the back of the head; that he picked up a chair cushion, put it over Dean's head, and shot him again through the cushion; and that he and Harris then flew to Phoenix and met with Knott. Hardin also mentioned occasions prior to the killing on which Harris received Western Union money orders.

When Dean's body was found, a blank telegram form and two shell casings were found on the floor in front of his body. A cushion with powder burns was found on the upper portion of his body, and there were two bullet wounds in his head. The time of death was estimated to have been at approximately 2:00 to 4:00 a.m., on August 10.

Mary Beth Wabol, Ridle's sister, testified that defendant had called Star Systems, on occasion, to talk with Ridle. She also testified that she had observed Knott and Harris exchange money and that, on several occasions, Hardin had accompanied Harris to the club.

Police Officer Richard Craven testified that receipts for four money orders were found in a house trailer in which Knott had resided. All were for money orders addressed to John Harris.

Dr. Emanuel Tanay, a psychiatrist, testified on defendant's behalf that his diagnosis was that defendant suffered from a paranoid disorder, which was a psychotic illness, and that he had imposter's syndrome which caused him to believe that someone else had been put in his brother's place; that defendant had been involved with the idea of having his brother killed since February 1981; and that it was his opinion that defendant was mentally ill and could not refrain from his actions.

On rebuttal, expert witnesses for the state offered their opinions that defendant was sane at the time of the acts and could have refrained from procuring someone to kill his brother.

Defendant raises five assignments of error:

"* * *

"IV. Crucial evidence was admitted in violation of rule and constitutional confrontation rights: telephone records were never adequately identified to serve the proof purpose of the state and thus required building inference upon inference; telegraphic receipts were never made relevant; alleged co-conspirator declarations were not tied up, unreliable, and not in furtherance.

"V. Defendant was entitled to judgment of acquittal of aggravated murder, as the state failed to produce evidence sufficient to convince a rational trier of fact beyond a reasonable doubt that defendant was acting in complicity with Anthony Ridle, Harry Knott, John Harris, David Harden [sic], only uncorroborated testimony of an 'accomplice' implicates defendant as conspiring with these persons."

In his fourth assignment of error, defendant contends that it was error to

permit Hardin to testify as to statements Harris had made to him, which tended to link Harris to a conspiracy involving defendant.

Portions of Evid. R. 801 are important to our inquiry:

"(A) Statement. A 'statement' is (1) an oral or written assertion * * *.

"(B) Declarant. A 'declarant' is a person who makes a statement.

"(C) Hearsay. 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

"(D) Statements which are not hearsay. A statement is not hearsay if:

"* * *

"(2) Admission by party-opponent. The statement is offered against a party and is * * * (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."

The rule recognized by Ohio courts concerning admission of out-of-court declarations of co-conspirators, prior to the adoption of the Rules of Evidence, permitted testimony of such declarations but was stated in terms of an exception to the rule against hearsay:

"In a criminal case, where the existence of a conspiracy to rob has been established, an extrajudicial statement of a co-conspirator made in furtherance of the objectives of that conspiracy is admissible in evidence as an exception to the hearsay rule, and is not violative of defendant's constitutional right of confrontation and cross-examination." State v. Carver (1972), 30 Ohio St. 2d 280 [59 O.O.2d 343], paragraph two of the syllabus.

The rationale given by the Supreme Court for the long-standing rule is that declarations of a party's co-conspirator should be admissible essentially the same as if made by the party since by the act of conspiring together the conspirators have joined together in a common design and the declarations of each should be regarded as the declarations of all, each being deemed the agent of all. Fouts v. State (1857), 7 Ohio St. 471, 476; Patton v. State (1856), 6 Ohio St. 467, 470. That this agency-related theory still has vitality is evidenced by the Supreme Court having grouped the rule of Evid. R. 801 (D)(2), together with agency-related concepts.

The plain language of Evid. R. 801 (D)(2)(e) indicates that the co-conspirator rule applies if five conditions are established:

(1) The existence of a conspiracy;

(2) The defendant's participation in the conspiracy;

(3) The declarant's participation in the conspiracy;

(4) The statement was made during the course of the conspiracy; and

(5) The statement was in furtherance of the conspiracy. See Giannelli, Ohio Evidence Manual (1982), Section 801.15.

A conspiracy exists where two or more persons plan or agree to commit a crime, coupled with an overt act substantial enough to show an intention to carry the conspiracy through to completion. See R.C. 2923.01. While the Supreme Court has not construed Evid. R. 801 (D)(2)(e) at any length, we find no indication in the rule itself to indicate that the Supreme Court, in adopting the rule, intended to change two important safeguards found in the case law predating the Rules of Evidence:

(1) That, as to the order of proof concerning the existence of a conspiracy, and of the defendant's and declarant's participation in it, the evidence must have been received prior to the proffer of the co-conspirator's out-of-court declaration. See State v. Thomas (1980), 61 Ohio St. 2d 223, at 232 [15 O.O.3d 234]; State v. Osborne (1976), 49 Ohio St. 2d 135, at 143 [3 O.O.3d 79]; State v. Carver, supra, paragraph two of the syllabus; Fouts v. State, supra, paragraph two of the syllabus.

(2) That the standard of proof to be met in showing the existence of a par-

ticipation in the conspiracy by independent evidence is that of making out a *prima facie* case. *State* v. *Thomas, supra,* at 232; *State* v. *Weind* (1977), 50 Ohio St. 2d 224, at 240-241 [4 O.O.3d 413]; *State* v. *Osborne, supra,* at 143. For argument contra, see Giannelli, Ohio Evidence Manual, *supra,* at Section 801.15 (e).

Defendant argues that the trial court erred in admitting the out-of-court declarations because (1) the state had not yet introduced sufficient proof that connected Harris to Knott, so that the existence of a conspiracy involving Harris, Knott, and defendant had not been established, and (2) the declarations were neither made during the course of the conspiracy, nor in its furtherance. The testimony objected to by defendant was that of Hardin to the effect that Harris told him various things about Dean Milo's whereabouts, that defendant wanted his brother killed, and that defendant had been arrested. In overruling defendant's objections, the trial court held that the only thing required of the state to prove as a condition precedent to the proffered testimony was that a conspiracy involving defendant existed, and that the state was not required to prove also that defendant was involved as a co-conspirator with the declarant. As pointed out above, the trial court erred in its understanding of the law. Although there was sufficient evidence at that point to make out a *prima facie* case that a conspiracy existed involving defendant, Ridle, Sessic, and Knott, and another involving Harris and Hardin, there was insufficient proof that the declarant (Harris) was involved in the conspiracy in which defendant was involved.

However, while it was error to admit Hardin's testimony at that point in the proceedings, the error was not prejudicial in view of other abundant testimony which was presented later linking Harris and Hardin to Knott, and thereby to the conspiracy in which defendant was involved. In addition, the declarations themselves — of defendant's desire to have his brother killed — were only cumulative of other evidence on this point. See, *e.g., Harrington* v. *California* (1969), 395 U.S. 250. Indeed, the declarations are consistent with defendant's theory of the case, as evidenced by these excerpts from his brief:

"* * * FRED MILO was in a state of raging internal conflict, despite his external submission to both his brother Dean's and his parents' conflicting pressures and demands. The treatment meted out by Dean was not only threatening family unity and the family business, it was uncharacteristic and grossly disrespectful to the head of the family. Determining that Dean could not be acting in such a manner, FRED decided that a substitute was destroying the family.

"* * *

"The Defendant presented the testimony of Dr. Emanuel Tanay, a forensic psychiatrist, who concluded after extensive interviews, review of the tapes of those interviews, research into family and ethnic background, and study of the statements which the alleged co-conspirators gave concerning FREDERICK MILO'S conduct, that FREDERICK MILO suffered from a paranoid disorder, and had a paranoid delusion that his brother had been replaced (Capgras' syndrome); such mental illness caused a severe defect in his rational powers, leading him to act to solve the terrible family and business conflict by removing its source — Dean Milo's replacement. FREDERICK MILO, in the doctor's opinion, was unable to refrain from acting in such a manner."

Accordingly, it cannot be argued that the declarations were of such an inflammatory nature as to prejudice defendant's cause in the eyes of the jury. The fourth assignment of error is overruled.

Defendant's fifth assignment of error is predicated upon his assertion that there was insufficient evidence to corroborate the testimony of a co-conspirator, Ridle, that defendant was involved in the conspiracy which resulted in his brother's

murder. This assertion is founded upon case law, and R.C. 2923.03, which in pertinent part provides:

"(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

"(1) Solicit or procure another to commit the offense;

"(2) Aid or abet another in committing the offense;

"(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

"* * *

"(D) No person shall be convicted of complicity under this section solely upon the testimony of an accomplice, unsupported by other evidence."

The "other evidence" referred to in R.C. 2923.03 (D) may consist of the testimony of other accomplices or coconspirators. *State* v. *Vorys* (1978), 56 Ohio St. 2d 107 [10 O.O.3d 302]. It is not necessary that the crime be proved independently of the testimony of the accomplice, or that the testimony of the accomplice be corroborated in every particular, but only that there be circumstantial evidence, or testimony of some other witness, tending to connect defendant with the crime and to prove some of the material facts testified to by the accomplice. *State* v. *Robinson* (1910), 83 Ohio St. 136, at 143; *State* v. *Allsup* (1980), 67 Ohio App. 2d 131 [21 O.O.3d 439]. See, also, *State* v. *Pearson* (1980), 62 Ohio St. 2d 291 [16 O.O.3d 332]. It is not necessary that the defendant be shown to have known the identity of all his coconspirators or accomplices when it is shown that the defendant knew, or had reasonable cause to believe, that a person with whom he conspired also conspired with another to commit the offense. See R.C. 2923.01 (C).

As was the case in his fourth assignment of error, defendant asserts that there was no evidence to link a conspiracy which may have involved himself, Ridle, Sessic, and Knott, with one involving Harris and Hardin.

We disagree with defendant's version of the evidence, as there was sufficient evidence both to corroborate Ridle's testimony and to link defendant with the entire conspiracy that resulted in Dean Milo's death.

For example, Wabol testified that Knott and Harris had been friends prior to the killing; that the telephone bill for Star Systems indicated that a call had been placed to Akron on July 31, 1980, and charges had been reversed for a call from Cleveland to the club on August 1, 1980; and that she saw Hardin at the club in August 1980. Hardin testified that he heard Harris talking by telephone to "Harry" in Arizona; that prior to the killing he called Knott in Tempe, Arizona and asked him for money and received money through a Western Union money order; that after the murder he and Harris returned to Arizona, where Hardin met Knott; and that, after their return to Arizona, Harris called Knott and asked for money for Hardin and Hardin then received $700. The receipts found in Knott's former trailer residence in Arizona were for money orders purchased in Arizona and sent to John Harris in Ohio. Delores Fisi testified that she and her husband were in Phoenix with Dean Milo at the same time Ridle had said that defendant had alerted him that Dean would be in Phoenix, and during the time Ridle said an abortive attempt had been made by Knott and a hit man to kill Dean. The evidence of telephone calls having been made between defendant's telephone number and Sessic's, and between Sessic's and Tempe, Arizona, tended to corroborate Ridle's testimony concerning telephone calls made between Sessic and defendant, and Sessic and Arizona.

Accordingly, the fifth assignment of error is overruled.

The assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

REILLY and MOYER, JJ., concur.