## State v. Cassidy
*[Cite as 2 AOA 527]*

*Case No. 88AP-1054*
*Franklin County, (10th)*
*Decided March 6, 1990*

*R.C. 2903.01*
*R.C. 2923.01*
*Evid. R. 801(D)*

*Mr. David J. Graeff, for appellant.*

*Mr. Michael Miller, Prosecuting Attorney, and Ms. Bonnie Maxton, for appellee.*

BOWMAN, J.

Defendant, Diana Cassidy, was charged with the aggravated murder of her husband, James Cassidy, with the specification that it was for hire. On May 12, 1987, defendant's husband ("decedent") was murdered in his home by seventeen-year-old Daniel Morrow, who was adjudged a delinquent in juvenile court of aggravated murder. The evidence showed that Morrow was contacted by Phillip Randall Peer

to kill the decedent. Peer, who was tried as an adult, was convicted of aggravated murder with the specification that it was for hire, and that conviction was affirmed by this court in *State* v. *Peer* (June 8, 1989), No. 88AP-1018, unreported (1989 Opinions 2006), with no further appeal pending.

The evidence presented at defendant's trial demonstrated that decedent's daughter, Lori Cassidy, hated her father and contacted Peer to kill him. The state attempted to connect defendant with this scheme to support the charge of aggravated murder for hire against her. Through a series of witnesses, the state presented evidence to show that defendant for many years had been unhappy with her marriage to decedent and that more than once defendant had expressed the wish that decedent would be dead. Friends of both defendant and her daughter testified that defendant often spoke of wanting to hire someone to kill her husband.

Evidence of defendant's bank records further showed that large sums of money were withdrawn near the time of the murder. However, there was no direct evidence to show what defendant did with most of the money.

The custodian of the records for Bank One testified that, during the months of April and May 1987, a total of $21,302.59 was withdrawn from defendant's bank account and that the account was closed on May 13, 1987, one day after her husband's murder. In addition, the custodian of the records for Star Bank (f.k.a. Ohio State Bank) testified that defendant opened an account on May 14, depositing $13,302.59. That account was closed one week later with the money being deposited into a new account with the same bank by an attorney. However, the account, a form of a trust account, was still in defendant's name.

Defendant presented no evidence in defense and the jury returned a verdict of guilty of aggravated murder with the specification that it was for hire. At the mitigation portion of the bifurcated trial, the jury recommended a life sentence. Defendant now appeals her conviction and sets forth the following assignments of error:

"1. WHERE THE TESTIMONY AT TRIAL SHOWS A CONSPIRACY TO MURDER AND THE PROSECUTION'S WITNESSES TESTIFY TO HEARSAY STATEMENTS IN FURTHERANCE OF THE CONSPIRACY, THE ACCUSED IS DENIED A FAIR TRIAL GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION, WHEN THE STATEMENTS DO NOT LINK THE ACCUSED TO THE CONSPIRACY AND THE TRIAL COURT ADMITS SAID HEARSAY STATEMENTS WITHOUT PRELIMINARILY ESTABLISHING THE EXISTENCE OF A CONSPIRACY.

"2. (A) WHERE EVIDENCE ADDUCED AT TRIAL DOES NOT LINK THE ACCUSED TO THE CIRCUMSTANCES SURROUNDING THE HOMICIDE AND SAID EVIDENCE DOES NOT SHOW A SCHEME DESIGNED TO IMPLEMENT THE CALCULATED DECISION TO KILL, A FINDING BY THE TRIER OF FACT OF PRIOR CALCULATION AND DESIGN IS NOT SUBSTANTIATED BY THE LAW ESTABLISHED UNDER *STATE V. COTTON,* 56 Ohio St. 2d 8.

"(B). WHERE THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

By her two assignments of error, defendant raises one basic error with the trial court's judgment: that the conviction is based entirely upon circumstances evidence or hearsay evidence, from which impermissible inferences were drawn by the jury. As the two assignments of error are both related to the evidence presented at trial, and whether there was sufficient admissible evidence to support defendant's conviction of aggravated murder, they will be discussed together.

In order to convict a person of aggravated murder, the state must prove beyond a reasonable doubt that defendant purposely and with prior calculation and design caused the death of another. R.C. 2903.01. "Purposely" is defined in R.C. 2901.22(A) which states, "[a] person acts purposely when it is his specific intention to cause a certain result ***." Furthermore, paragraph one of the syllabus of *State* v. *Robbins* (1979), 58 Ohio St. 2d 74, holds:

"Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show, a scheme designed to implement the calculated decision to kill, finding by the trier of fact of prior calculation and design is justified. ***"

Thus, the burden was upon the state to establish that defendant purposely, with prior calculation and design, caused the death of her husband.

Defendant contends that she was in effect tried and convicted of conspiracy to commit

murder, although she was not charged with conspiracy. It is defendant's contention that the effect of this was to allow impermissible hearsay statements into evidence. However, defendant was charged with aggravated murder with the specification that it was for hire, which necessarily by its very nature involves a conspiracy. Therefore, conspiracy does become relevant to this case.

A detailed review of the evidence presented by the state is necessary prior to addressing defendant's assignments of error as both raise specific evidentiary issues.

David Morris, a Columbus police officer, testified that, as a result of talking with Peer, Morris arrested defendant and obtained defendant's bank records. There was also evidence to show where the gun and shell casings were found, again as a result of Morris talking with Peer.

Next, a series of witnesses testified, who knew defendant and her daughter, and had spoken with defendant regarding defendant's desire to see her husband dead. These witnesses had known defendant for varied amounts of time, with each relating statements of how unhappy defendant said he was and that defendant had even spoken to each witness about hiring someone to kill her husband. One of Lori's (defendant's daughter) friends testified that Lori told her that she (Lori) had hired someone to have her father killed. This friend also testified that Lori did not mention defendant in this context.

The testimony of one of these friends included a specific conversation between the witness, defendant and Lori. The witness testified that defendant gave the house keys to Lori, telling Lori to give the keys to Peer so it would not look like a forced entry. When asked by the state if the witness knew what the conversation was regarding, she testified that she believed, but did not know, it was about putting a contract on decedent's life. The three of them also discussed how defendant and her daughter would live (financially) after the event. The witness testified that defendant stated she would probably take a second mortgage on the house as it would cost her "*** ten or $15,000 to do this. "***" (Tr. 478.) The witness and Lori then dropped off the key at Peer's home. The witness also testified that Lori had spoken often about hiring someone to kill her father.

The next significant witness to testify on behalf of the state was Curt Akers who stated that defendant had contacted him about finding someone to kill her husband. Akers testified that defendant's requests continued for a couple of weeks in March 1987. According to Akers' testimony, although he told defendant he knew someone who could kill her husband, it was his intention to obtain the money from defendant, but not to follow through with killing defendant's husband; however, before defendant could pay Akers, the "contract" fell through.

The last major witness to testify on behalf of the state was Daniel Morrow, who actually shot defendant's husband. Morrow testified that Peer, whom Morrow had worked for previously, approached Morrow about killing defendant's husband. The day of the shooting, Morrow stated that he took some Valiums and drank alcohol causing him to have several blackouts. Lori drove Morrow to defendant's home at which time he saw a woman, whom he was never able to identify, get into a large black car and leave. Morrow then recounted how he shot defendant's husband in the basement and, further, how afterwards Peer got rid of the gun and other items.

Morrow then testified regarding the next time he saw Peer and how together they went to a bank because Peer said they were to get paid for the job. Morrow thought he saw the same large black car at the bank, but could not be sure nor did he see was driving it. Further, he did not see what car Peer got into; however, when he came back to his car, Peer had a "wad" of money. Morrow said he received $500 to $800 as "hush money."

Defendant's counsel objected to several of these witnesses testifying as to what other people told them, contending such testimony is hearsay. Since there are two categories of witnesses which defendant now contends were permitted to give impermissible hearsay testimony, they will be examined separately as different rules apply to each.

Defendant takes issue with the admission of all of the out-of-court statements made by defendant, including statements she had made to various friends and relatives regarding defendant's desire to see her husband dead. These statements occurred over a period of ten to fifteen years,and sometimes were made when defendant was angry, having recently argued with her husband.

Although it is not entirely clear from her brief with which statements defendant takes issue, any statement that she personally made to any one of these witnesses is not hearsay by definition. Evid. R. 801(D)(2) provides that "[a]

statement is not hearsay if *** [it] is offered against a party and is (a) his own statement ***." Therefore, any statements made by defendant to witnesses were not hearsay and were admissible.

It would also appear defendant is raising a credibility argument as to these statements in that these witnesses should not have been believed. However, that is an issue primarily for the trier of fact, not an appellate court. See *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, paragraph one of the syllabus.

Turning to statements which defendant contends were impermissibly introduced as co-conspirator statements, there were several witnesses who testified that Lori had expressed to them the wish that her father was dead. One such witness testified that Lori inquired into hiring someone to kill her father.

Daniel Morrow, the actual killer, testified that he was told by Peer that a girl wanted her father killed. However, Morrow did not know defendant or even if she was involved.

While defendant is correct in her discussion of the law regarding co-conspirator's statements, it does not apply to the facts of this case. Prior to such hearsay statements being admissible, the state must offer independent proof of defendant's involvement in the conspiracy. See Evid. R. 801(D) and *State* v. *Milo* 1982), 6 Ohio App. 3d 19. In *Milo,* we held that it was error to allow a witness to testify as to statements made by defendant to a co-conspirator that connected defendant with the conspiracy prior to independent evidence establishing defendant's involvement in the conspiracy.

None of these statements regarding what Lori or Peer said to any of these witnesses connected defendant with the conspiracy whatsoever, as the evidence showed the conspiracy existed only between Lori, Peer and Morrow. None of these witnesses who were part of the conspiracy to kill defendant's husband mentioned defendant or even implied that defendant was involved. As such, *Milo* is inapplicable to this case. Only if those statements to which defendant now objects had inferred defendant's connection with the conspiracy would there have been a *Milo* problem.

Although the statements were clearly hearsay, as they were made by someone other than the declarant while testifying in court, defendant is unable to show any prejudice as she was not implicated in the murder by those statements. Therefore, as the court held in paragraph seven of the syllabus in *State* v. *Bayless* (1976), 48 Ohio St. 2d 73:

"Error in the admission of evidence in criminal proceedings is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction. ***"

Even if the trial court had properly excluded these statements of defendant's alleged co-conspirators, the outcome of the case would not have been different. As stated previously, because the statements did not even connect defendant with the crime, they could not have contributed to her conviction.

Defendant further contends that Officer Morris' testimony, regarding his actions after speaking with Peer, was hearsay. While it is true that statements which are offered to explain an officer's conduct in an investigation are not always hearsay, there are times when such statements still must be excluded. See *State* v. *Blevins* (1987), 36 Ohio App. 3d 147, at 149.

Although Officer Morris did not relate specifically what Peer told him, the effect was the same. In his testimony, Morris stated that as a result of talking with Peer, he arrested defendant. The logical conclusion of this testimony is that Peer told Morris that defendant was somehow involved in the murder of her husband.[1] The result was that in an "indirect" fashion, hearsay evidence was admitted.

Having concluded that Morris' testimony included hearsay which, by inference, implicated defendant in the conspiracy to kill her husband, we turn to the determination of whether it was prejudicial to admit such statements prior to independent proof of defendant's involvement in the conspiracy. See *Milo, supra.*

R.C. 2923.01 provides that a conspiracy has been established where the evidence shows that two or more people plan or agree to commit a crime and in furtherance of that crime, take a substantial step which shows an intention to carry out the crime. *Milo, supra.* Therefore, in order for the hearsay testimony of Officer Morris to be properly admissible, the state needed to present sufficient evidence to link defendant with the plan to murder her husband. It follows from defendant's second assignment of error that if her conviction is against the manifest weight of the evidence, then there was not the requisite evidence to link defendant to the conspiracy to murder her husband, and the

hearsay testimony of Morris was improperly admitted.

From the evidence presented at defendant's trial, there can be no doubt that a plot to murder James Cassidy existed among Lori Cassidy, Randy Peer and Daniel Morrow, and thus the first condition of *Milo* is met. However, the evidence introduced in an attempt to link defendant with this plot was scant at best.

Where there is no direct evidence to establish defendant's guilt, as is the case here, circumstantial evidence may still support a conviction. However, as the court held in the syllabus of *State* v. *Kulig* (1974), 37 Ohio St. 2d 157:

"Circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt."

Closely tied to the concept of circumstantial evidence is the permissive use of inferences to establish guilt. This court held in *State* v. *Ebright* (1983), 11 Ohio App. 3d 97, at 99, the following regarding inferences:

"The extent of the Ohio rule against drawing an inference from another inference is amply stated in case law:

"'An inference based solely and entirely upon another inference, unsupported by an additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury.

"'An inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by jury.' *Hurt* v. *Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329 [58 0.0. 119], paragraphs one and two of the syllabus.

"'*The only inferences of fact which the law recognizes are immediate inferences from facts proved, but a given state of facts may give rise to two or more inferences, and in such case one inference is not built upon another but each is drawn separately from the same facts.*' *McDougall* v. *Glenn Cartage Co.* (1959), 169 Ohio St. 522 [9 0.0.2d 12], paragraph two of the syllabus.

"The principle underlying the rule is that, where an inference is based solely and entirely upon another inference, its foundation is so insecure that reliance upon the second inference would stretch credulity beyond its permissible bounds and result in an inferred fact which in reality is speculative, raising merely a conjecture or possibility." (Emphasis added.)

Since Peer refused to testify, the state had to rely entirely upon circumstantial evidence to support defendant's conviction. That evidence established the following: that defendant was unhappy in her marriage, at least some of the time; that at times she made statements to the effect that she wished he was dead; that she might, at some point, even hire someone to kill him. Furthermore, there was evidence to show that defendant withdrew a substantial amount of money from her account. However, there is no evidence whatsoever to show what defendant did with that money, other than opening a new account with a portion of it. The evidence also showed that once defendant went so far as to contact someone (Akers) who could arrange to have her husband killed. But that same evidence also shows, for whatever reason, that defendant did not go through with that plan. There was one statement which defendant allegedly made in the presence of one of her daughter's friends regarding giving the keys to the house to Peer so it would not look as if there had been a forced entry. That one statement was the *only* piece of evidence which directly linked defendant to Peer and by inference on an inference links her to the plot to murder her husband.

The state also relies upon the testimony of Morrow to establish the link. However, his testimony did not even mention defendant. Morrow's only contact was with Lori and Peer. He could not identify defendant or the car which he thinks he saw on the day of the murder and possibly again on the day Peer paid him.

From the above evidence, quantum leaps in logic are required to conclude that defendant is guilty of aggravated murder, and thus involved in the plot to kill her husband. Merely because she disliked her husband and may have earlier even made an unsuccessful attempt to hire someone to kill her husband, it cannot be immediately inferred that she also hired Peer. It is equally impermissible to infer that because defendant withdrew a substantial amount of money from the bank that she paid it to Peer, especially when there is *no* direct evidence to show that defendant even knew Peer or how much money Peer received for hiking Morrow to do the killing. Furthermore, as held in *Kulig, supra*, such circumstantial evidence must be irreconcilable with a reasonable theory of innocence. When there is no evidence whatsoever to show what defendant did with the money, there are clearly other reasonable theories of what she did with it.

532

Additionally, even assuming that Morrow did see the same car at defendant's house the day of the murder, and at the bank the day Peer paid him, there is no evidence to establish who Morrow saw the first day nor who was driving the car the second day. To conclude it was defendant would require several inferences--first, that it was defendant whom Morrow saw, then that defendant was driving the car the second day (and not Lori or someone else), and further that Peer got into that car to obtain the money. Again, these inferences are not the only reasonable ones to draw from these facts and, as we held in *Ebright, supra*, at 101:

"*** [T]he inferences which support guilt must be so strong that they exclude the drawing from the same underlying facts of reasonable inferences which support innocence. ***"

It is clear from the evidence that without any link between defendant and the conspiracy there are several reasonable inferences that may be drawn from this evidence and, thus, resolving all doubt in favor of defendant, the conviction is against the manifest weight of the evidence.

The state's entire case rested upon circumstantial evidence from which the jury was impermissibly allowed to draw unreasonable, unsupported and indirect inferences. It is possible that, upon retrial, Peer's testimony may or may not provide the missing link.[2] However, defendant's present conviction is against the manifest weight of the evidence and may not stand.

As stated previously, a determination that defendant's conviction is against the manifest weight of the evidence necessarily means that there was not "abundant" independent evidence to link defendant with the conspiracy, as required by the second condition of *Milo*. Therefore, it was error for the trial court to admit Officer Morris' testimony of what he did as the result of talking with Peer. This testimony inferred defendant's participation in the conspiracy and would only be admissible if the conspiracy was shown. However, in light of our decision regarding defendant's manifest weight contention, the admission of such testimony was not prejudicial.

Accordingly, as there is not substantial evidence to establish defendant's participation in the plot to murder her husband, defendant's second assignment of error is well-taken. Defendant's first assignment of error is not well-taken to the extent that defendant is not prejudiced. Furthermore, pursuant to *State* v. *Kostura* (1957), 166 Ohio St. 189, the judgment

of the Franklin County Court of Common Pleas is reversed and this cause is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

REILLY, P.J., and HOOPER, J., concur.

HOOPER, J., of the Miami County Court of Common Pleas, sitting by assignment in the Tenth Appellate District

---

[1] This type of evidence has been referred to as "indirect hearsay." See Falknor, "Indirect" Hearsay (1956), 31 Tulane L. Rev. 3.

[2] Peer refused to testify at defendant's original trial, claiming the privilege against self-incrimination contained in the Fifth Amendment. Peer has been found guilty and his conviction has been upheld by this court with further appeal pending. On remand of the case *sub judice*, Peer can no longer rely upon that Fifth Amendment privilege, for as the court held in *United States* v. *Heldt* (C.A.D.C. 1981), 668 F. 2d 1238, at 1253, certiorari denied (1982), 102 S.Ct. 1971:

"It is established law that because a witness has been found guilty of the actions in question he is no longer entitled to claim the privilege of the fifth amendment with respect to those matters and he may be compelled to testify about them. ***" See, also, *United States* v. *Pardo* (C.A.D.C. 1980), 636 F. 2d 535; *United States* v. *Romero* (C.A.2, 1957), 249 F. 2d 371; and *State* v. *Dick* (1971), 27 Ohio St. 2d 162, paragraph two of the syllabus. Therefore, Peer could be called to testify at defendant's retrial.