[Cite as *State v. Dunson*, 2014-Ohio-234.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                   :

     Plaintiff-Appellee                     :               C.A. CASE NO.    25693

v.                                              :               T.C. NO.    12CR1991/2

JAMES L. DUNSON                                 :               (Criminal appeal from
                                                     Common Pleas Court)

     Defendant-Appellant                    :

                                                :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____24th____ day of ____January____, 2014.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

WILLIAM O. CASS, JR., Atty. Reg. No. 0034517, 135 W. Dorothy Lane, Suite 209, Kettering, Ohio 45429
       Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of James L. Dunson,

filed March 25, 2013. Dunson appeals from his March 15, 2013 judgment entry of conviction on two counts of murder (proximate result), in violation of R.C. 2903.02(B), along with two firearm specifications; one count of aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), along with a firearm specification; and one count of aggravated robbery (serious harm), in violation of R.C. 2911.01(A)(3), along with a firearm specification. At sentencing, the trial court noted that the murder counts were subject to merger, and that the State elected to proceed to sentencing on count one. The court merged the aggravated robbery counts into count one, and it merged the firearm specifications into one firearm specification. The trial court sentenced Dunson to 15 years to life for murder, and to an additional three year term on the firearm specification. We hereby affirm the judgment of the trial court.

{¶ 2} The victim herein is Geoffrey Andrews, who was 20 years old at the time of his death. At trial, Torrance Hill testified that he and Andrews were friends, and that in June of 2012, Andrews resided at the Amhurst Apartments in Riverside. Hill stated that Andrews sold marijuana from his residence, and that on June 15, 2012, at approximately 10:45 p.m., he and Treyvon Johnson went to Andrews' apartment to buy some marijuana, after phoning Andrews prior to their arrival. Hill testified that when they arrived, Andrews was sitting on his couch counting money, with a gun beside him to the left. Hill stated that Andrews showed him and Johnson some marijuana that he kept on a shelf in the living room, and that the three men then sat down to watch t.v. Hill stated that a few minutes later, Andrews received a cell phone call and then advised Hill that Andrews' cousin was coming to the apartment and to open the front door. Hill stated that after he opened the

door, "[s]ome people" entered the apartment. Hill specifically stated that three people "came in and they shot." He testified that the intruders were black, and that he "seen one with a hoodie on." Hill testified that he "[j]umped and fell on the ground" on the left side of the couch, and that he heard three gunshots in succession. Hill stated that he got up after he heard the screen door to the apartment close, and that he observed Andrews "coming out the kitchen," holding his arm and bleeding. Hill stated that Andrews told him to call the police, and that he did so. According to Hill, Andrews fell to the floor, and Hill "put the gun up and I was looking at [Andrews] making sure he was all right." Hill stated that he put Andrews' gun in the attic to protect him. Hill stated that officers arrived within three to four minutes, and that he told them that "it was three black men" who robbed Andrews. Hill testified that he later went to the police department, where he told officers that the robbers were three black men.

{¶ 3} Tommy Neal testified that on June 15, 2012, he resided at the Arrow Rock Apartments, which are behind the Amhurst Apartments. At around 11:05 p.m. on the date of the shooting, Neal testified that he "walked out back to dump the grease" from some pork chops, and that he "heard four gunshots, seen four males in dark colored hoodies come running around the apartments * * * ." He stated that the area was lit with streetlights and porch lights. Neal stated that the four men got into a white car that "peeled out." Neal stated that he could not determine the race of the men, and that one of them was "a little bit slower than the rest, but they was all definitely running together."

{¶ 4} Robert Shott testified that he is a deputy coroner and forensic pathologist at the Montgomery County Coroner's Office, and that he performed an autopsy on Andrews.

He testified to a reasonable degree of medical certainty that Andrews' cause of death was a "gunshot wound of the torso," and that the manner of death was homicide. Shott identified a photograph of the entrance gunshot wound on the right side of Andrews' body, and he testified that after the bullet "passed through the skin, the bullet went through the fourth rib on the right side, fracturing that rib. * * * During its course, it went through the middle lobe of the right lung, internally. It passed through the heart through both chambers on the right side and the left side of the heart." Shott stated that the bullet then "passed through two lobes of the left lung, the upper and lower lobe on the left lung. By that point, its momentum had been slowed sufficiently that it stayed within the left chest cavity outside the left lung." Shott stated that Andrews suffered "massive blood loss internally." He stated that he retrieved a small caliber bullet consistent with a .22 caliber weapon from Andrews' body. Shott identified the bullet that he recovered during the autopsy in the course of his testimony.

{¶ 5} Michael Sullivan testified that he is a City of Riverside police officer, and that he was dispatched to the scene of the shooting, 4217 Amston Drive, at around 11:07 p.m. When he arrived, he observed Officer Stamper, who had also been dispatched to the scene, "walking towards an apartment" with Treyvon Johnson and Torrance Hill. Sullivan stated that he spoke to Hill and Johnson briefly, and that they "said there were three black males that had fled the scene." Sullivan stated that he entered the apartment and observed Andrews on the floor. He testified that he recovered a .22 caliber bullet from the north wall of the apartment, and that he gave it to Officer Krueger, an evidence technician.

{¶ 6} On cross-examination, Sullivan identified his police report, and he testified, "It

says, 'All they' - - meaning Johnson and Mr. Hill  - - 'All they were able to tell me was that there were about three black males that had come into the apartment and shot their friend.'" Sullivan stated that Johnson and Hill were "emotional, excited, urgent in their demeanor."  On redirect examination, Sullivan stated that Hilll and Johnson each told him that there were three black males involved in the shooting of Andrews, and that the word "about" in his report, quoted above, was not used by Hill and Johnson in describing the robbers.

{¶ 7}    Christine Krueger testified that she is a Riverside Police Officer and an evidence technician.  She stated that she was dispatched to the scene of the shooting,  and that Andrews' body was in the foyer, just  inside the front door when she arrived.  She identified photographs taken by her at the scene.   She stated that a Crown Royal bag on a shelving unit on the east wall of the living room had a large and a small baggie of marijuana in it.  She stated that there was also loose marijuana on the shelving unit, and that a small baggie of marijuana was found under the couch.  She stated that she discovered two bundles of cash, each containing a thousand dollars, in Andrews' bedroom closet as well as loose cash in a clothes hamper in the closet. Krueger testified that a thousand dollars bundled together is known as a "stack."

{¶ 8}    Krueger identified a photograph of a bullet hole in the north wall above the couch, and she stated that Officer Sullivan recovered the bullet from the hole and gave it to her. She also identified a photograph of a bullet hole in the shelving unit on the east wall of the apartment, which she stated was a foot and a half to two feet from the other bullet hole.   Kreuger stated that the second bullet was recovered from the east wall behind the shelving unit.   Krueger identified two bullets recovered from the scene.   Krueger stated that she recovered three .22 caliber casings in the area of the foyer of the apartment. She stated that she recovered a loaded

.45 caliber handgun, a phone charger and a small baggie of marijuana from the attic, which is accessed by pull-down stairs.

{¶ 9} Chris Monturo testified that he has been employed since 1995 by the Miami Valley Regional Crime Laboratory as a forensic firearm and tool mark examiner. Monturo testified that he examined and compared the three shell casing recovered from the scene and determined to a reasonable degree of scientific certainty that they were fired from the same .22 caliber automatic. He stated that he also examined the three bullets recovered from the shooting, and that he could not confirm that they came from the same weapon. He opined, however that the bullets "have the characteristics of having been fired from an Intro-tech, Tech .22. It's a semiauto .22 pistol made by Intro-Tech."

{¶ 10} Jeffrey Trego testified that he is a detective with the Riverside Police Department, and that he responded to the scene of the shooting. Trego stated that he interviewed Torrance Hill and Treyvon Johnson within two hours of the shooting at the Riverside Police Department, and that a broadcast was subsequently issued describing the shooting suspects as "three black males, small in stature." Trego testified that Dunson is five feet, three inches in height.

{¶ 11} Trego stated that he interviewed Dunson on June 28, 2012, in the Riverside Police Department interview room, after advising him of his rights. Trego stated that Dunson indicated that he understood his rights and agreed to speak to him. Trego testified that Dunson told him that his street name is "Blood." After initially denying involvement in the shooting, Trego stated that Dunson admitted going to Andrews' apartment complex at the time of the shooting with LaMichael Jones, Aaron Baker and Richard Western. Trego stated that Dunson

told him that Holly McReynolds drove them to the apartment complex, and that she remained in her vehicle. According to Trego, Jones is five feet, six inches in height, and Western is five feet, eight inches in height, and both men are black. Trego stated that Baker, whose nickname is "Ghost," is five feet, eleven inches tall, and Trego testified that Baker is "a pale, white male with blond hair and blue eyes." Trego stated that Dunson advised him that the "plan was to go get some weed and then do a robbery." Trego stated that Dunson told him the robbery had been planned for two weeks, and "[t]hat he was in for a robbery that was supposed to be committed in Fairborn for a couple stacks and some weed." Trego stated that Dunson told him that "he was not involved" in the robbery of Andrews. According to Trego, Dunson stated that at the time of the shooting, "he was outside the apartment by a tree in the complex there." Trego stated that Dunson told him that he heard three shots fired in Andrews' apartment. Trego stated that Dunson admitted that he wore a hoodie sweatshirt on the night of the shooting. Trego testified that Dunson told him a .22 caliber weapon was used to shoot Andrews, and Dunson "said all the individuals that were there handled the gun prior to and post the shooting." Trego stated that Dunson told him that upon hearing the gunfire he "ran back to the vehicle, but was passed up by the other persons involved. They got back to the vehicle and left and drove to McReynolds' house in Trotwood." Trego stated that Dunson told him that after the shooting, "bleach was put on the gun and it was thrown in a dumpster." Trego stated that the weapon was not recovered. Trego identified Dunson's written statement, and he stated that it provides, in part, that Dunson "'[w]ent to get LaMichael from his girlfriend's house'" prior to the shooting. Trego stated that Morgan Klink is Jones' girlfriend.

{¶ 12} On cross-examination, Trego stated that Dunson contacted authorities and

volunteered to speak to them about the shooting. Trego stated that Dunson told him that he believed that the purpose of the visit to Andrews' apartment was to buy marijuana. Trego stated that in the course of his investigation, he learned that Jones made contact with Andrews by cell phone prior to the shooting, and that Western and Jones were in continuous cell phone contact on the day of the shooting. On redirect examination, Trego stated that the Riverside police were looking for Dunson when he contacted them about the shooting. He stated that at the time Dunson was interviewed, Jones had already been arrested.

{¶ 13} Morgan Klink testified that she was 19 years old at the time of the shooting, and that she and Andrews had been friends for about a year. Klink stated that two days before the shooting, she told LaMichael Jones, her boyfriend of six weeks, that Andrews kept a gun under the couch or next to the t.v., and that he kept marijuana on a shelf in the living room. The trial court overruled defense counsel's objection to Klink's testimony regarding her conversation with Jones, noting that the "State has established the fact of a conspiracy," and "that is an exception to the rule that the State is allowed to solicit coconspirator statements." Klink stated that she told Jones where Andrews kept the drugs and gun because "I didn't want anybody to get hurt, so I wanted them to be aware of where it was going to be." Klink stated that Jones told her that he was going to rob Andrews with "Chicago and Blood," whose real names she did not know, and that she did not know that the men were going to take a weapon to Andrews' apartment. She testified that "[i]t was just supposed to be a simple robbery."

{¶ 14} Klink denied that Jones ever mentioned "a robbery in Fairborn of a white boy." She stated that on the day of the shooting, Jones left her residence at about 10:30 p.m. after receiving a phone call, and that he was picked up by Holly McReynolds, who was driving a

"white two door with a loud exhaust." Klink stated that she observed someone get out of the passenger side of the car to let Jones get into the back seat. Klink stated that she knew that Jones was going to Andrews' apartment to rob him. Klink stated that she learned of Andrews' death later in the evening. She stated that five days later Riverside police officers came to her home, and that she went with them to the police department, where she denied any knowledge of the robbery. She stated that she returned to the police department the following day and told officers that she knew that Jones planned to rob Andrews with "Blood and Chicago."

{¶ 15} James Vance testified that he is a detective with the Riverside Police Department, and that he is also an evidence technician. He stated that he responded to the scene of the shooting, and that he recovered a bullet from the east wall of Andrews' apartment, which he turned over to Krueger. He stated that he interviewed Holly McReynolds in the course of his investigation at her apartment, and that she owned a white Honda two-door Civic. Vance identified photos of the vehicle depicting an enlarged muffler.

{¶ 16} The parties stipulated that the following cell phone number, 937-732-2557, was the cell phone number used by Jones on June 15, 2012, and that his carrier was Cricket. Rodney Bowman testified that he is employed by AT&T, and he identified subscriber information for Rochelle Wilcox at the following number: 937-286-6554. Bowman testified that AT&T cell phone records reflect that on June 15, 2012, at 10:38 p.m., and at 11:05 p.m., the phone number 937-286-6554 received calls from Jones' number, above, and that the first call lasted one minute and 15 seconds, and that the second call lasted 15 seconds.

{¶ 17} Rochelle Wilcox testified that she is Andrews' mother. She stated that Andrews had a Samsung Galaxy smartphone, and that his carrier was AT&T. She stated that the phone

was in her name, and that Andrews' phone number was 937-286-6554.

{¶ 18}    Dunson asserts three assignments of error herein.   We will consider his first and second assigned errors together.   They are as follows:

"THE APPELLANT'S CONVICTIONS WAS (sic) AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE,"

And,

"THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE APPELLANT'S CONVICTIONS."

{¶ 19}    Dunson asserts that there was insufficient evidence to prove that he participated in the robbery or shooting, since no one "testified that they saw the Appellant do anything to contribute to the robbery or shooting, other than being present and leaving with the others."

{¶ 20}    As this Court has previously noted:

When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn* (2000), 138 Ohio App.3d 449, 471. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."   *State v. Jenks* (1991), 61 Ohio

St.3d 259, paragraph two of the syllabus.

Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

*State v. Hammock*, 2d Dist. Montgomery No. 24664, 2012-Ohio-419, ¶ 11-12.

**{¶ 21}** R.C. 2903.02(B) provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2911.01(A) provides as follows:

No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

\* \* \*

(3) Inflict, or attempt to inflict, serious physical harm on another.

**{¶ 22}** We note that pursuant to R.C. 2923.03, a defendant who joins with another to commit an offense may be charged either as principal or as an aider and abetter, and we note that the the trial court instructed the jury as follows: "If you find that the Defendant knowingly aided, helped, assisted, encouraged, directed, or associated himself with another for the purpose of committing a crime, he is regarded as if he is the principle (sic) offender and is just as guilty as if he personally performed every act constituting the crime." We further note, however, "[i]n the absence of a conspiracy or some preceding connection with the transaction, one does not aid or abet if he merely sees a crime being committed. Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding and abetting of the act." *State v. Vogler*, 2d Dist. Miami No. 89-CA-12, 1990 WL 94597, \*3 (June 26, 1990).

**{¶ 23}** Having thoroughly reviewed the entire record, we conclude that Dunson's judgment entry of conviction is supported by legally sufficient evidence, and that this is not an exceptional case in which the evidence weighs heavily against the conviction. Dunson admitted to Trego that he planned for two weeks to commit a robbery for a "couple stacks and some weed," and that he, Jones, Western, and Baker went to Andrews' apartment, in McReynolds' car, on the night of the shooting with a .22 caliber weapon. Andrews' apartment contained two "stacks" and marijuana. Monturo testified that the three shell casings recovered from the scene by Krueger were fired from a .22 caliber weapon, and that the bullets recovered from the scene and Andrews' body had consistent characteristics of having been fired from a certain type of .22

caliber weapon. Klink testified that she told Jones where Andrews kept his marijuana and his gun so that no one would be hurt in the planned robbery. Klink further testified that Jones told her that he intended to rob Andrews with "Blood and Chicago," and Trego testified that Dunson admitted that his street name is "Blood." In his written statement, Dunson indicated that he was in the car when Jones was picked up at Klink's home. According to Bowman, cell phone records confirmed that Jones called Andrews just before the men entered the apartment, and Bowman's testimony is consistent with Hill's regarding Andrews' receipt of a phone call just before the shooting. While Dunson asserts that he remained outside during the robbery, Hill testified that three black males robbed Andrews, and Dunson, Jones and Western are the only black males in the group; Baker is white. Hill stated that he observed one robber in a hoodie, and Dunson told Trego that he wore a hoodie on the night of the shooting. Further, the suspects were described as small in stature, and while Dunson, Jones and Western are shorter in height, Baker is five feet, eleven inches tall. Neal testified that he observed four men run to a white car immediately after the shooting, and Dunson admitted that he fled the scene and disposed of the murder weapon. Vance provided testimony regarding McReynolds' vehicle. For the foregoing reasons, we conclude that since the evidence supports Dunson's conviction, and since his conviction is not against the manifest weight of the evidence, Dunson's first two assigned errors are overruled.

{¶ 24} Dunson's third assigned error is as follows:

"THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATEMENTS OF A CO-DEFENDANT TO BE INTRODUCED."

{¶ 25} Dunson asserts that the court erred when it allowed Klink "to testify that her

boyfriend, LaMichael Jones, told her that he was going to rob Andrews with Chicago and Blood (the Appellant)." According to Dunson, the "only evidence of a conspiracy was the Appellant's statements to Trego. However, the Appellant told Trego that he had discussed with the others a different robbery, one that was to occur in Fairborn, not the one at Andrews' apartment. Other than Appellant being at the scene, there was no evidence that he conspired to rob Andrews that day."

{¶ 26} "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In general, hearsay is not admissible. Evid.R. 802. Evidence Rule 801(D)(2) provides, however, that a statement is not hearsay if the "statement is offered against a party and is * * * (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy."

{¶ 27} As this Court has previously noted:

[C]ertain out of court statements are not considered hearsay, and are admissible, if, (1) prior to admitting the statement, there is a prima facie showing from independent evidence that there was a conspiracy of which the declarant and defendant were a part, and (2) that the declarant made the statement during the course of and in furtherance of a conspiracy. It matters not whether the defendant is on trial for conspiracy, complicity, or even the tort of wrongful death. For the statement to be admissible, it is sufficient that there is a prima facie showing of what *in fact* amounts to a conspiracy, regardless of the crime being prosecuted * * *.

The Tenth District Court of Appeals has held that:

The plain language of Evid.R. 801(D)(2) indicates that the co-conspirator

rule applies if five conditions are established:

(1) The existence of a conspiracy;

(2) The defendant's participation in the conspiracy;

(3) The declarant's participation in the conspiracy;

(4) The statement was made during the course of the conspiracy; and

(5) The statement was in furtherance of the conspiracy. *State v. Milo*

(1982), 6 Ohio App.3d 19, 22. Moreover, as to the order of proof concerning the

existence of a conspiracy, and of the defedant's and declarant's participation in it,

the evidence must have been received prior to the proffer of the co-conspirator's

out-of-court declaration. *Id.* \* \* \* . *State v. Merrick*, 2d Dist. Champaign No.

89-CA-16, 1990 WL 177661, *1-2 (Nov. 16, 1990).

{¶ 28} Prior to Klink's testimony regarding Jones' statements to her, Trego testified

that Dunson admitted to him that he, Jones, Western and Baker planned to commit a robbery for

"a couple of stacks and some weed" on the night that Andrews was shot, and that Dunson's street

name is "Blood." Trego testified that Dunson's written statement indicates that Dunson went to

get Jones at Klink's home, and that Dunson told him that he, Jones, Western and Baker went to

Andrews' apartment complex with a .22 caliber weapon on the night of the shooting, that they

fled together after Andrews was shot, and that they bleached the murder weapon and threw it in a

dumpster. As noted by the Seventh District, the "last requirement in Evid .R. 801(D)(2)(e) of

independent proof of the conspiracy does not impose a high burden; it merely means that the state

must make a prima facie showing sufficient to raise the inference of a conspiracy. See *State v.*

*Stores* (Mar. 22, 1996), 7th Dist. No. 96CA24, citing *State v. Carter* (1995), 72 Ohio St.3d 545, 550, 651 N.E.2d 965." *State v. Spires*, 7th Dist. Noble No. 04 NO 317, 2005-Ohio-4471, ¶ 40. As the State asserts, Dunson's admissions to Trego established a prima facie showing of a conspiracy to commit aggravated robbery with Jones. Since independent proof of a conspiracy between Jones and Dunson was introduced prior to Klink's testimony, the trial court did not err in admitting her testimony regarding Jones' statements that he intended to commit a robbery with "Blood." There being no merit to Dunson's third assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and FAIN, J., concur.

Copies mailed to:

Andrew T. French
William O. Cass, Jr.
Hon. Dennis J. Adkins