The STATE of Ohio, Appellee,

v.

ADKINS, Appellant.

[Cite as *State v. Adkins* (2000), 136 Ohio App.3d 765.]

Court of Appeals of Ohio,
Third District, Hancock County.

No. 5–98–27.

Decided March 13, 2000.

768

*Robert A. Fry,* Prosecuting Attorney, and *Kristen K. Johnson,* Assistant Prosecuting Attorney, Findlay, for appellee.

*Maria Santo,* for appellant.

SHAW, Judge.

Defendant Thomas Adkins appeals his conviction of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) that was entered on a jury verdict in the Hancock County Court of Common Pleas on May 26, 1998. On July 16, 1998, the trial court sentenced defendant to serve eight years imprisonment for this offense. In two assignments of error, defendant asserts that the trial court erred in admitting certain state evidence and in overruling a Crim. R. 29 motion for acquittal. For the reasons stated below, we overrule the assigned errors but are compelled to reverse and remand for plain error because the requisite predicate offenses submitted to the jury in this case were each incapable of supporting the conviction as a matter of law.

In late April 1996, law enforcement officials in Kentucky discovered sixty-five bundles of marijuana weighing over eight hundred-fifty pounds stowed in the trailer of a semi truck that was heading north through Kentucky from Texas. Both state and federal law enforcement officials decided to accompany the shipment to its intended destination, Cherry's Farm Market in Putnam County, Ohio. Investigators recorded events of the delivery by audio and videotape. Those tapes, introduced at trial, indicated that Mr. Bradley Cherry, an owner of Cherry's Farm Market, refused the delivery after the truck driver signaled to warn him that he was wearing a recording device. The truck driver had not been informed that the police were also video taping his conduct as well as listening.

Though the controlled delivery of the load of marijuana failed, investigation of Cherry's Farm Market continued. Police learned, from phone records belonging to Cherry's Farm Market, that a phone call was made from that business to the residence of a Jesse Ramirez, Sr. after the delivery of marijuana was turned

away by Cherry on April 28, 1996. Cherry testified at the trial in this case and admitted that he had called Jesse Ramirez, Sr. soon after the delivery truck left his business. Subsequent investigation revealed that Jesse Ramirez, Sr. controlled an extensive drug enterprise based in Northwest, Ohio. It was this enterprise with which the state alleged defendant was associated in violation of Ohio's corrupt activities statute, R.C. 2923.32(A)(1).

The state's investigation centered on various telephone records of Jesse Ramirez, Sr. and others associated with him. Among those records secured by investigators were recordings of phone conversations between Jesse Ramirez, Sr. and persons he paid to transport drugs from Texas to Ohio. Based on the information provided by these phone calls, investigators learned of several trips to Texas they suspected were for the purpose of smuggling marijuana to northwest Ohio.

The lead investigator in this case, Lieutenant Wood of the Defiance County Sheriff's Department, testified at defendant's trial. Wood gave background testimony detailing the investigation into the Ramirez enterprise, and also testimony discussing the type and value of the drugs being shipped by the enterprise. Wood testified that in April 1996, marijuana could be purchased in northwest Ohio for approximately eight hundred dollars a pound. He also testified that the eight hundred-fifty pounds of marijuana seized by Kentucky investigators would have a street value of "well over two million" dollars.

Based on information gained from the wiretapped phone calls, investigators eventually learned that the trips to Texas were being made in several large Chevrolet Suburbans, and that marijuana was being smuggled to Ohio in the modified gas tanks of these automobiles.

"Q: Here's a question I have to ask. In the course of your investigation, referring to the exhibit which is the large gas tank in the middle of the room, how much gas does it hold after it's been altered like that?

"A: We asked that question. We never really got a correct answer. We never filled it up. I guess not less than 10, 15 gallons.

"Q: Did the suburban have another gas tank on it, or just one tank?

"A: Just one tank, sir.

"* * *

"Q: Do you know how many gallons the tank was suppose[d] to hold before it was modified?

"A: Those are the reason [sic] they're using the suburbans because of the size of the gas tanks. Those are not normal size gas tanks. I would guess

probably 30 plus gallons. Maybe 40 even. I'm not sure. I could find out, but I'm not sure."

However, Wood stated that he decided not to interrupt intermediate shipments because he hoped to gain more information about the Ramirez enterprise through continued monitoring and wiretapping of phone calls from and to Jesse Ramirez, Sr. and others. Based on information obtained from these phone calls, Wood traveled to certain motels in Texas in early 1997 and obtained motel registration information. He testified that one particular motel provided him with documents that indicated defendant had registered for the same room that Jesse Ramirez, Sr. phoned on November 1, 1996, to give Dennis Jones instructions on a marijuana shipment. It should be noted that of the nearly 3,000 telephone conversations intercepted by investigators, Wood could not identify any single call that recorded defendant's voice or recorded a person mentioning defendant's name. However, after a subsequent search of the defendant's home, Wood discovered a motel receipt indicating that the defendant had also been registered as a guest in a Texas motel on November 8, 1996.

At trial, Dennis Jones confirmed that the defendant had traveled with him to Texas on two occasions in November 1996, and knew that on those trips Jones planned to pick up marijuana in Texas and transport it back to Ohio. Jones testified that on the first occasion, he went to defendant's house and the two men left for Texas from that location:

"Q: You indicated that you went to [defendant] Tom Adkins's [sic] house. Why did you go to Tom Adkins's [sic] house at that time?

"A: Because that's where the suburban was.

"Q: And why were you going to Tom Adkins's [sic] house knowing that there was going to be a suburban there?

"A: Because we was [sic] going to make a trip to Texas to go get marijuana.

"Q: Who arranged for that trip?

"A: My wife had arranged for that first trip with Tom Adkins."

Jones explained that the two men drove a large white Chevrolet Suburban truck that had been purchased for Jones' wife Debbie Green by Jesse Ramirez, Sr. Jones testified that he and defendant "switched off" driving the Suburban to a town in southern Texas, where they waited for a man named Pato to visit them at their motel. Upon Pato's arrival, he gave Pato the keys to the suburban truck and Pato then left with that vehicle. Jones stated further that Pato returned the truck to their motel within a day or two. Jones explained that neither he nor defendant inspected the truck, but simply drove it back to a designated location in Hancock County, Ohio. Jones indicated that after they returned from the first

trip, they simply left the Suburban at the defendant's house. Jones stated that he paid defendant $500 for each of the trips, and shared with defendant one half of the expense money leftover from the trips. Jones testified that Jesse Ramirez, Sr. paid him $3,000 for the first trip and $5,000 for the second trip he made with defendant.

Additionally, the state submitted registration slips indicating that defendant had registered for motels in Weslaco, Texas, on November 1, 1996, and also on November 8, 1996. Defendant also received a traffic warning ticket in Texas on November 1, 1996, while driving the same Chevrolet Suburban described on the motel registration slips. Dennis Jones confirmed that he was present when defendant received the traffic ticket. Jones also stated that he was present when the defendant had registered for their hotel room on the first trip and that the defendant had been required to present identification when registering.

However, law officers did not seize any marijuana from defendant or Jones as a result of the two trips in November 1996, and no marijuana was introduced at trial from either of these two trips. The state did display to the jury nineteen bundles of marijuana, weighing a total of approximately ninety-five pounds, that had been seized from the gas tank of a Chevrolet Suburban truck belonging to Debbie Green in Defiance County, Ohio, on December 10, 1996. Wood testified that the truck had the same Indiana license plate as that described on the two motel registration forms purportedly signed by the defendant on November 1, 1996 and November 8, 1996 in Weslaco, Texas. Wood also testified that the same vehicle and license plate number were described on the Texas traffic warning ticket that had been issued to defendant on November 1, 1996. Dennis Jones also confirmed that he and the defendant had driven that same Suburban on both occasions.

The state also placed before the jury the eight hundred-fifty pounds of marijuana intercepted by Kentucky law enforcement officials that was en route to Cherry's Farm Market in April 1996. However, the state presented no evidence that defendant was involved with this shipment of marijuana.

Finally, the state called two other witnesses who stated they transported drugs for the Ramirez enterprise during late 1996. The first courier to testify was John Miller, who related how he traveled to Texas for the purpose of picking up drugs and transporting them back to Ohio for Jesse Ramirez, Sr. Miller described a substantially similar procedure for picking up the drugs as did Dennis Jones, and detailed three trips he alone made from November 2, 1996 to December 7, 1996 in a brown and tan Chevrolet Suburban truck.[1]

---

1. This was a different vehicle than that allegedly used by the defendant.

Lucinda Steckley also testified about her experiences as a drug runner for the Ramirez enterprise. Steckley recalled four trips to Texas she made with Debbie Green between October 1996 to December 1996, in the same truck that defendant and Jones allegedly used. Steckley described essentially the same method of transporting drugs as had both John Miller and Dennis Jones, and testified that Debbie Green had paid her $500 for each trip.

The matter was submitted to a jury, and defendant was convicted of engaging in a pattern of corrupt activities, a first degree felony violation of R.C. 2923.32(A)(1). He now takes this appeal and raises two assignments of error. We will begin by addressing defendant's second assignment of error.

### Second Assignment of Error

"The trial court committed an error of law when it allowed the State to present evidence pursuant to Evid. R. 801(D)(2)(e)."

Defendant contends that the trial court prejudicially erred when it admitted, over his objection, out of court statements between alleged co-conspirators prior to the admission of any evidence indicating that defendant himself participated in the alleged conspiracy. The contested statements presented to the jury were audio taped conversations between Jesse Ramirez, Sr., Dennis Jones, and Debbie Green on November 1, 1996 and November 8, 1996. Of these three people, only Dennis Jones was called as a witness by the state later in the trial.

The first taped conversation was between Ramirez, Sr. and Debbie Green on November 1, 1996, wherein Green described to Ramirez a motel name, phone number and room number. The next audio tape contained a phone call from Jesse Ramirez, Sr. minutes after the Green phone call, wherein Ramirez, Sr. phoned the number given to him by Green and asked for the room number Green described to him. Ramirez spoke to Dennis Jones and asked, "did you get down there alright?" Jones responded, "We broke down . . . fuel filter went out . . . it will get us back." The third audiotape was of another conversation between Debbie Green and Ramirez, Sr. on November 8, 1996, during which Green told Ramirez, Sr. of another motel name, phone number and room number. The third tape was played to the jury after Wood explained that he found a motel receipt in the defendant's residence indicating that defendant was registered as a guest in the motel room Green described to Ramirez during the conversation.

Defendant objected to the playing of all three tapes, arguing that they were inadmissible hearsay under Evid.R. 801(D)(2)(e). When ruling on defendant's objection to the state's playing of these audiotapes, the trial judge stated:

"Okay. I think I have a full understanding now of how this is going to unfold. *Court's going to permit the playing of the tape subject to the link up that you've talked about, Mr. Fry.* I guess if you want to take the chance, its (*sic* ) your case. If you can't link it up, it will all be stricken by the Court. That's the bottom line of how it shakes out, short of it coming in through Jones or Wood or whoever you indicated yesterday. You were going to recall this witness at a later time in the trial. So, I mean, it's a leap. If you want to take it, take it.

"That's based on the nature of defense counsel's cross, for purposes of the record here. We're talking about the two tapes that were talked about—the two dates, November 1st and November 8th." (Emphasis added.)

We first note that trial courts are authorized to make rulings that admit evidence that is "conditionally relevant"; that is, evidence that is relevant only if other evidence subsequently presented demonstrates facts necessary to establish the relevancy of the previously-admitted evidence. See Evid.R. 104(B); see generally Weissenberger's Ohio Evidence (1999) 26–7, Sections 104.8–104.9. Moreover, preliminary rulings as to the admissibility of evidence and the order of presentation are generally within the discretion of the trial court. Cf. Evid.R. 104(A).

Despite these principles, defendant urges that the trial court's ruling was improper, arguing that an out of court statement offered in evidence for the truth of the matter asserted therein is inherently unreliable hearsay evidence. Evid. R. 801(C) and Evid. R. 802. However, under Evid.R. 801(D)(2)(e), "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Evid. R. 801(D)(2)(e). Defendant cites *State v. Milo* (1982), 6 Ohio App.3d 19, 6 OBR 44, 451 N.E.2d 1253, and argues that as interpreted in that case, Evid.R. 801(D)(2)(e) requires independent proof of the defendant's participation in a conspiracy *prior* to the admission of a co-conspirator's statement. Defendant concludes that because independent proof of his participation in the conspiracy was not offered into evidence until after the tapes were played, they are inadmissible hearsay.

While we agree with defendant that in order for the out-of-court declaration of a co-conspirator to be admissible the state must prove 1) the existence of the conspiracy, 2) that the declaration was made during the course of the conspiracy, 3) that the declaration was made in furtherance of the conspiracy, 4) the declarant's participation in the conspiracy, and 5) the defendant's participation in the conspiracy, see, *e.g., State v. Daniels* (1993), 92 Ohio App.3d 473, 482, 636 N.E.2d 336, 341–342, we disagree with defendant's contention that these facts must all be established prior to the admission of a co-conspirator's state-

ment in furtherance of the conspiracy. But see *Milo,* 6 Ohio App.3d at 24, 6 OBR at 48–49, 451 N.E.2d at 1258–1259. Rather, Evid.R. 801(D)(2)(e) merely requires the presentation of evidence as to one factor—the existence of the conspiracy—prior to the admission of a co-conspirator's statement. In *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, the Supreme Court noted that "pursuant to the express terms of the rule, the statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) *until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof.*" (Emphasis added.) *Id.* at 550, 651 N.E.2d at 972. The *Milo* court's additional requirement of prior independent proof of the *defendant's participation* in the conspiracy is inconsistent with the Supreme Court's subsequent decision in *Carter,* as well as the plain text of Evid.R. 801(D)(2)(e).

Here, while the state presented no independent evidence of defendant's participation in the conspiracy until after the tapes were played, the State had previously presented substantial independent evidence of the existence and nature of the Ramirez drug enterprise. Cf. *Carter,* 72 Ohio St.3d at 549–550, 651 N.E.2d at 971–972. This evidence made a prima facie showing of the existence of a conspiracy sufficient to justify admission of the tapes. See *id.* Moreover, the trial court's ruling on defendant's objection to the playing of the tapes provided an additional protection, in that the tapes were only admitted on the condition that the state later link defendant to the conspiracy. See Evid.R. 104(B). Accordingly, pursuant to *State v. Carter* we find no error in the trial court's decision to admit the contents of the tapes.

Moreover, we agree with the trial court's decision to permit the state to play the audiotapes because defense counsel opened the door for admission of the tapes through his cross-examination of Wood. During cross-examination, the following exchange occurred:

"Q. 'Prior to November 4, 1997 [a few days before Adkins' home was searched] what specific phone records did you have knowledge of *that you believe tied Tom Adkins to Jesse Ramirez, Jr. or Sr.?*'

"* * *

"A. I believe it would have been a call 1st of November, 1996, going from 278–8412, coming from Debbie Green to Jesus Ramirez, Sr., then going from Jesus Ramirez, Sr. to a motel in the Weslaco area. And again, be the same scenario on November the 8th of 1996." (Emphasis added.)

Defense counsel's question was apparently intended to leave the impression that because defendant's voice and name do not appear on any of the tapes, that he could not be tied to the Ramirez drug enterprise *through* the tapes. It was

not error for the trial judge to allow the state to play the contents of the tapes to counter this impression.

Finally, even assuming that the trial court's decision to allow the tapes to be played prior to any independent proof of defendant's participation in the conspiracy somehow constitutes error, such error was unquestionably harmless. See *Carter*, 72 Ohio St.3d at 550, 651 N.E.2d at 971–972. The state subsequently presented the testimony of Dennis Jones, who provided independent testimony as to defendant's actions and role in the enterprise. Other evidence established the roles of the several declarants heard on each tape, and indicated that the statements made were in furtherance of the conspiracy. The mere fact that some of that evidence was presented after the tapes were played cannot constitute prejudice to the defendant on these facts. For the foregoing reasons, defendant's second assignment of error is overruled.

### First Assignment of Error

"The trial court committed an error of law by denying the defendant's Crim. R. 29 motion for acquittal."

■ Pursuant to Crim.R. 29(A), defendant's counsel moved for acquittal at the conclusion of the state's case and renewed that motion at the conclusion of trial and once again after the jury rendered its verdict. The trial court overruled the motions. Defendant now asserts that the court's decisions were erroneous and that the state presented insufficient evidence to justify his conviction for engaging in a pattern of corrupt activity.

■ We have recognized that "Crim. R. 29(A) requires the court, upon motion of the defendant, to enter a judgment of acquittal of one or more offenses charged in an indictment if the evidence is insufficient to sustain a conviction of the offense or offenses." *State v. Pickett* (1996), 108 Ohio App.3d 312, 314, 670 N.E.2d 576, 578. However, a court "may not grant an acquittal by authority of Crim. R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt." *Id;* see also *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus.

■ "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

Finally, we are mindful of the general appellate maxim that a correct judgment will not be reversed by a reviewing court simply because it was rendered based upon incorrect reasoning.

Defendant was convicted of engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1). Our inquiry therefore requires us to determine whether any rational trier of fact could have found the essential elements of R.C. 2923.32(A)(1) proven beyond a reasonable doubt.[2] The statutory definition of "Engaging in a pattern of corrupt activity" is that:

"No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." R.C. 2923.32(A)(1).

The elements of that offense are further defined in R.C. 2923.31. Relevant definitions, in effect at the time of the offense alleged here, are as follows:

"(C) 'Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises.

"* * *

"(E) *'Pattern of corrupt activity' means two or more incidents of corrupt activity,* whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event. * * * * For the purposes of the criminal penalties that may be imposed pursuant to section 2923.32 of the Revised Code, *at least one of the incidents forming the pattern shall constitute a felony under the laws of this state in existence at the time it was committed*[.]

"* * *

"(I) 'Corrupt activity' means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any of the following:

"* * *

---

**2.** Each of the various statutes involved in this charge has been amended, and some have been amended multiple times. All of the quotations and citations in this opinion are to the statutes in effect in November, 1996, unless otherwise noted, because that is the period when defendant's two trips to Texas are alleged to have occurred.

"(2) Conduct constituting any of the following:

"* * *

"(c) *Any violation of section* * * * *2925.03* * * * *of the Revised Code, any violation of section 2925.11 of the Revised Code that is a felony of the first, second, third, or fourth degree* * * * *when* * * * *value of the contraband or other property illegally possessed, sold, or purchased in the violation exceeds five hundred dollars* * * *."* (Emphasis added.) R.C. 2923.31.[3]

The statute defines "corrupt activity" as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in * * * conduct constituting" one of the predicate offenses listed in R.C. 2923.31(I)(2). See, *e.g., State v. Schlosser* (1997), 79 Ohio St.3d 329, 335, 681 N.E.2d 911, 915–916. In this context, the statute also requires that to constitute "corrupt activity," the "proceeds of the violation" or "combination of violations" must be at least $500. R.C. 2923.31(I)(2)(c).

Of particular concern in this case is the requirement that a defendant engage in a "pattern of corrupt activity," meaning two or more predicate offenses constituting corrupt activity. R.C. 2923.31(E). Although an essential element of R.C. 2923.32(A)(1) is the presence of the requisite number of predicate offenses, the indictment does not state which predicate offense or offenses listed in R.C. 2923.31(I)(2) comprise the instances of defendant's "pattern of corrupt activity." Instead, the indictment merely alleges that defendant "participated directly or indirectly in the affairs of [the Ramirez drug] enterprise through a pattern of corrupt activity":

"[F]rom the 28th day of April, 1996 until the 10th day of December, 1996, at Pleasant Township, Hancock County, Ohio, Thomas Henry Woodrow Adkins did [*sic* ] being associated with an enterprise engaged in the sale and distribution of a controlled substance, to wit: Marihuana, did participate directly or indirectly in the affairs of said enterprise *through a pattern of corrupt activity* and the value of the contraband or other property illegally possessed, sold or purchased through the pattern of corrupt activity exceeds Five Hundred Dollars ($500.00) in violation of the Ohio Revised Code, Title 29 Section 2923.32(A)(1), and against the peace and dignity of the State of Ohio."

Likewise, the state's amended bill of particulars merely alleges that the "[Ramirez] enterprise was engaged in the sale and distribution of Marihuana,"

---

**3.** The language "any violation of section 2925.11 of the Revised Code that is a felony of the first, second, third, or fourth degree * * * " was added by 1996 Am. Sub. H.B. 269, effective July 1, 1996. However, the version of the statute quoted in 1996 H.B. 333, effective September 19, 1996, appears to have invadvertently omitted that language. See Page's Ohio Revised Code Annotated, 1996 Bulletin # 7 at 975.

and further alleges that defendant " * * * participate[d] directly in the affairs of the enterprise through a pattern of corrupt activity and the value of the contraband or other property illegally possessed, sold or purchased through the pattern of corrupt activity exceeds Five Hundred Dollars[.]"

Due to the failure to specify any alleged predicate offenses in the indictment or bill of particulars, it remained unresolved at the time of defendant's initial Crim.R. 29(A) motions which predicate offenses the defendant was alleged to have committed. The state has similarly failed to identify any predicate offenses in its brief on appeal. The state therefore forces this court to speculate which of the possible predicate offenses enumerated in the statute as "corrupt activities" apply to determine the sufficiency of its' case against the defendant.

Notwithstanding the failure to specify predicate offenses, it is apparent from both the briefs and the record that the state's position was that defendant's "corrupt activity" was his alleged involvement in transporting a controlled substance, specifically marijuana, from southern Texas to Hancock County, Ohio, on two occasions in November 1996. However, defendant argues that even if believed by a rational trier of fact, the conduct alleged to have occurred on those two trips is legally insufficient to establish a "pattern of corrupt activity" as defined in the statute: "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise" with at least one of the incidents constituting a felony offense.[4] R.C. 2923.31(E); cf. *State v. Feliciano* (1996), 115 Ohio App.3d 646, 653, 685 N.E.2d 1307, 1311. In reviewing defendant's claim, we note that if the state presented sufficient evidence to justify convictions for two instances of one of the offenses enumerated in R.C. 2923.31(I)(2)(c) as it existed at the time of the defendant's conduct, it has satisfied its Crim.R. 29(A) burden as it relates to a "pattern of corrupt activity."

The state apparently alleges that defendant made trips to Texas on November 1, 1996 and November 8, 1996, and on each occasion returned to Ohio with large amounts of marijuana hidden in the gas tank of a Chevy Suburban truck. R.C. 2925.11(A) states that "[n]o person shall knowingly obtain, possess, or use a controlled substance." For a violation of R.C. 2925.11 to constitute a predicate act under the corrupt activities statute, it must be a "felony of the first, second, third, or fourth degree." R.C. 2923.31(I)(2)(c). However, there is no fourth degree felony offense for possession of marijuana, the controlled substance at issue here. See R.C. 2925.11(C)(3). Rather, possession of marijuana constitutes a third degree felony if the offender possesses at least "1,000 grams" of

---

4. Moreover, because defendant was charged with a first degree felony charge of engaging in a pattern of corrupt activity, at least one of the incidents of corrupt activity must be a felony of first, second or third degree. See R.C. 2923.32(B)(1).

marijuana. R.C. 2925.11(C)(3)(d). Accordingly, if the evidence adduced in the state's case is sufficient to show that defendant was associated with the Ramirez drug enterprise, that he knowingly possessed at least one thousand grams of marijuana on two separate occasions, that both possessions were related to the Ramirez drug enterprise, that defendant was participating in the Ramirez drug enterprise on both occasions, and that the value of the marijuana was at least $500, the state has satisfied its burden under Crim.R. 29(A).

Defendant argues that no rational trier of fact could have found that he knowingly possessed at least one thousand grams of marijuana on two separate occasions. Defendant contends that the State's allegation that he knowingly possessed any marijuana at all is based upon improper multiple inferences. Specifically, defendant argues that even if a rational trier of fact could have concluded that he possessed marijuana in the Suburban truck on the dates of November 1 and November 8, 1996, that no rational trier of fact could conclude that he possessed one thousand grams of marijuana on those dates, see R.C. 2925.11(C)(3)(d), or that the marijuana possessed was valued at over $500. See R.C. 2923.31(I)(2)(c).

█ Because no marijuana was seized from either of defendant's trips to Texas, we agree that the evidence introduced here cannot *directly* indicate any instances where the defendant possessed at least one thousand grams of marijuana. However, the jury might reasonably infer that the defendant possessed marijuana in the requisite amounts, so long as those inferences are reasonably supported in the record. Cf. *State v. Palmer* (1997), 80 Ohio St.3d 543, 561, 687 N.E.2d 685, 701–702. Moreover, an inference may be based in part on other inferences, so long as that inference is also supported by other independent facts. See *id.*

Here, Dennis Jones, the defendant's alleged co-conspirator, testified that he traveled to Texas with the defendant on two separate occasions. Jones recounted the following conversation he had with the defendant as they returned to Ohio from Texas:

"Well, it come up that we were smuggling drugs, and we was kind of joking around where could it be. And Mr. Adkins says, well, I know where it's at. And he tipped the head of the head liner. He said it's up here. And I kind of agreed at that time, but I had no idea where it was at that time."

Earlier in his testimony, Jones was asked the following:

"Prosecutor: What was your purpose in taking the suburban to Texas?

"Jones: To bring back drugs to Ohio.

"Prosecutor: Was this discussed between you and Thomas Adkins on the way down?

"Jones: It was as far as, you know, saying yeah, that's what we was going for. It was—we talked about it a little bit, yeah.

"* * *

"Prosecutor: From your conversation with Tom Adkins on the way down, and your discussion about drugs, were you aware that Tom Adkins *knew what you was going to Texas for*?

"Jones: I'm pretty sure he did." (Emphasis added.)

Jones testified that he and defendant drove Debbie Green's Chevrolet Suburban to a town in southern Texas two times. Each time they delivered the truck to Pato, waited for a few days for Pato to return the truck to their motel, and then traveled back to Ohio. Neither Jones nor the defendant inspected the truck, but simply drove it back to a designated location. Jones stated that he paid the defendant $500 for each trip and split the balance of expense money not used during the trips with the defendant. Wood testified that during that general time period, marijuana was selling in northwest Ohio for approximately $800 a pound.

The state also presented evidence of Debbie Green and Lucinda Steckley's successful drug run one month after defendant's trip to Texas. On December 10, 1996, approximately ninety-five pounds of marijuana was seized from the gas tank of Debbie Green's Chevrolet Suburban, the same truck described on the motel registration form signed by the defendant on November 1, 1996 in Weslaco, Texas. Wood testified that the same vehicle and license plate number were described on a Texas traffic warning ticket issued to Thomas Adkins that was found by investigators after searching defendant's residence.

Accordingly, a reasonable factfinder could determine, based upon the foregoing testimony, including the method of interaction with Pato, payment of money and conversations, the telephone recordings and the motel receipts, that the defendant accompanied Dennis Jones to Texas on two separate occasions with the purpose of obtaining and possessing marijuana, that they in fact did so and transported it back to Ohio. Based upon all of the foregoing, as well as the amount of marijuana seized from the same Chevrolet Suburban with a modified gas tank, a reasonable factfinder could also conclude that the amount of marijuana obtained in each instance was over one thousand grams. Finally, based upon the testimony of Wood regarding the street value of marijuana and the amount of money defendant was allegedly paid, a reasonable factfinder could determine that the marijuana in each in instance was valued at over $500. See R.C. 2923.31(I)(2)(c).

In short, we believe that the evidence adduced in the state's case is sufficient to allow a factfinder to conclude that defendant was associated with the Ramirez drug enterprise, that he knowingly possessed at least one thousand grams of marijuana on two separate occasions, that both possessions were related to the Ramirez drug enterprise and that defendant was participating in the Ramirez drug enterprise on both occasions, and that the value of the marijuana was at least $500. Assuming that the two predicate offenses that the defendant was alleged to have engaged are third degree felony violations of R.C. 2925.11(C)(3)(d), we therefore conclude that the state met its burden under Crim.R. 29(A). Defendant's first assigned error is accordingly overruled. However, our inquiry does not end with the disposition of defendant's assignments of error.

We note that the Ohio Supreme Court has indicated the general standard of review to be followed by appellate courts examining lower court judgments: "[A]n appellate court should not consider questions which have not been properly raised in the trial court and upon which the trial court has had no opportunity to pass." *State v. Long* (1978), 53 Ohio St.2d 91, 95, 7 O.O.3d 178, 180, 372 N.E.2d 804, 807. However, "[p]lain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. We believe that the instant case poses an exceptional circumstance that demands application of the plain error rule.

Although the prosecution and the trial court purported to rely upon as many as six different factual "incidents" from which the jury could determine the defendant's involvement in the criminal enterprise, the record unequivocally establishes that defendant's conduct could only constitute two possible predicate offenses, either trafficking in marijuana under R.C. 2925.03 or felony drug abuse under R.C. 2925.11. Inasmuch as the state failed to specify any predicate offenses, the trial court was apparently left to deduce what they might be and instruct the jury accordingly.[5] Accordingly, in defining "corrupt activity" the trial court instructed the jury as follows:

---

5. The parties acquiesced in the trial court's decision to instruct the jury on trafficking in marijuana in violation of former R.C. 2925.03 and drug abuse in violation of R.C. 2925.11. Regrettably, our research of statutory and case authority has failed to find any requirement that the state specify its intended predicate offenses at the outset of a prosecution under R.C. 2923.32. However, it seems to us that this case certainly demonstrates that the better practice would be to do so. Of the six incidents noted in the jury instructions, the evidence in the

"Now corrupt activity includes engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in conduct constituting any violation of Ohio Revised Code Section 2925.03, trafficking in marijuana, or any violation of Ohio Revised Code Section 2925.11, drug abuse, when the proceeds of any combination of these offenses exceeds five hundred dollars.

"Now the essential elements of trafficking in marijuana, as it applies to this case, are as follows: That the Defendant *knowingly transported or delivered the controlled substance, marijuana, knowing or having reasonable cause to believe that such drug was intended for sale or resale* by the defendant or another." (Emphasis added.)

This instruction mirrors the elements of "trafficking in drugs" as that offense existed *prior* to July 1, 1996. See Sub. H.B. 391, 145 Ohio Laws, Part III 5768, 5771 (eff.7–21–94). *After* July 1, 1996, the time period with which we are here concerned, "trafficking in drugs" was defined as follows: "[n]o person shall knowingly sell or offer to sell a controlled substance." R.C. 2925.03(A). Therefore, the instructions given to the jury as to any violation of R.C. 2925.03, described the elements of an offense no longer in existence at the time of the defendants conduct. As such, any verdict returned on the basis of such an offense would be invalid as a matter of law.

However, the trial court also instructed the jury on the offense of "drug abuse" formerly codified in R.C. 2925.11, which could have established the necessary predicate offenses independently of R.C. 2925.03(A). Unfortunately, the trial court's instruction as to R.C. 2925.11 was limited to the following elements: "The essential elements of drug abuse as it relates to this case are as follows: The Defendant, Thomas Adkins, knowingly possessed a controlled substance, specifically marijuana."

As previously noted, the felony conviction under R.C. 2923.32 returned in this case, requires that a predicate offense based on R.C.2925.11 be at least a third degree felony (there being no fourth degree felony possession under the statute), which, in turn, requires that the possession be in an amount of at least one thousand grams. In short, for purposes of this case, the amount of one thousand grams is an essential element of the predicate offense of felony drug abuse. *Nowhere* does the record indicate that the jury was instructed that they must find the defendant possessed at least one thousand grams of marijuana, nor does

---

record reveals that four are entirely unrelated to the defendant. While these four trips may constitute evidence of the existence of an enterprise, none of these incidents could reasonably serve as the basis for concluding that the defendant engaged in activity constituting the requisite predicate offenses.

the jury verdict otherwise indicate any finding as to the amount of marijuana. Absent either an instruction or specific jury finding as to the amount of marijuana, any verdict returned on the basis of R.C. 2925.11 cannot constitute a *felony* drug abuse verdict and thus, cannot constitute the requisite predicate offense for a conviction under R.C 2923.32 as a matter of law.

In sum, for its only possible predicate offenses, the jury in the first instance was instructed and may have returned a verdict on a version of R.C. 2925.03 that was not a criminal offense at the time of defendant's conduct. In the second instance, the jury was instructed and may have returned a verdict based on a violation of R.C. 2925.11 that did not include the essential element of one thousand grams and therefore could not have constituted a felony drug abuse violation. In either event, the verdict cannot support a conviction under R.C. 2923.32.

We reiterate our conclusion reached in overruling the first assignment of error that this does not appear to be a case in which the *evidence* was factually insufficient to support one or more predicate offenses, if correctly submitted to the jury. Rather this is a case where the predicate offenses as submitted to the jury were *legally* flawed and thus, inadequate to support the conviction in this case under R.C. 2923.32 as a matter of law.

For the foregoing reasons, we overrule defendant's two assigned errors. However, because the record before us plainly demonstrates error that prejudiced substantial rights of the defendant, this case is reversed and remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

HADLEY, P.J., concurs.

THOMAS F. BRYANT, J., dissents.

THOMAS F. BRYANT, Judge.

As to the first assignment of error, the majority concludes that this is not a case in which the *evidence* is factually insufficient to support one or more predicate offenses. Rather, the majority holds that the predicate offenses as submitted to the jury were *legally* flawed and thus, inadequate to support the conviction as a matter of law. It follows that if the jury instructions had been legally correct, the majority presumably would have affirmed the conviction. While I agree with the conclusion that the jury instructions given in this case were erroneous and such error was prejudicial to defendant, the case should have never reached the jury.

Contrary to the conclusion reached by the majority today, I believe that defendant's Rule 29 motion for acquittal should have been granted at the close of the state's case-in-chief. More particularly, I believe that as a matter of law the evidence was insufficient with respect to whether defendant made a trip to Texas on November 8, 1996, whether defendant actually possessed at least one thousand grams of marihuana during either trip, whether the substance alleged to have been transported was in fact marihuana, and whether defendant possessed the requisite mental state.

Defendant moved for an acquittal at the conclusion of the state's case and renewed that motion at the conclusion of trial and once again after the jury rendered its verdict. The trial court, however, overruled each of defendant's requests. Disposition of this assignment of error begins by considering the propriety of the trial court overruling defendant's motion at the close of the state's case-in-chief.

Defendant was charged and convicted of engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1). The essential elements of "Engaging in a pattern of corrupt activity" are set out primarily in R.C. 2923.32(A)(1) and are further defined in R.C. 2923.31. An element of particular concern in this case is the requirement that a defendant engage in or conspire to engage in two or more predicate offenses constituting corrupt activity. See, R.C. 2923.31(E).

Although an essential element of R.C. 2923.32(A)(1) is the presence of the requisite number of predicate offenses, the indictment fails to state which predicate offense or offenses listed in R.C. 2923.31(I)(2) comprise the instances of defendant's "pattern of corrupt activity." R.C. 2923.32. Though not evident from the indictment, it is apparent from the record that the State's position at trial was that defendant's "corrupt activity" was his involvement in transporting a controlled substance, specifically marihuana, from Texas to Hancock County, Ohio, on two occasions. More particularly, the state alleged at trial that defendant made two trips with Dennis Jones to Texas, one on November 1, 1996, and the second on November 8, 1996. On appeal, the state relies on defendant's alleged association with Jones, a confessed drug runner for the Ramirez enterprise, as indicating that defendant was "employed by or associated with the Ramirez [drug] enterprise." Defendant argues that the conduct alleged by the state, being specifically the two trips, is insufficient to constitute a pattern of corrupt activity as defined by statute.

As noted, in its brief on appeal, the state does not identify which specific predicate offense or offenses constitute the "corrupt activity" in which it claims defendant was engaged. R.C. 2923.31(I). Of the five drug related offenses listed in R.C. 2923.31(I)(2)(c) that may serve as a predicate offense to corrupt activity, only two are even remotely implicated by the state's theory of its case, trafficking

in marihuana, R.C. 2925.03 and Possession of drugs, R.C. 2925.11.[6] The remaining offenses are: illegal manufacture of drugs or cultivation of marihuana, R.C. 2925.04, funding of drug or marihuana trafficking, R.C. 2925.05, and offenses involving counterfeit controlled substances, R.C. 2925.37. The state does not contend, nor does the record indicate, that defendant violated any of these latter three drug statutes. Accordingly, that leaves for consideration the offenses of trafficking in drugs and possession of drugs. R.C. 2925.03 and 2925.11 respectively.

The offense, trafficking in drugs, though sounding as if it might prohibit the transportation of controlled substances, actually provides only that "[n]o person shall knowingly sell or offer to sell a controlled substance." R.C. 2925.03(A). Trafficking in any amount of marihuana, the controlled substance at issue here, is at least a fifth degree felony. R.C. 2925.03(C)(3)(a). If the offense was committed within the vicinity of a school or if the offender sold or offered to sell more than two hundred but less than one thousand grams of marihuana the penalty is enhanced to a fourth degree felony. R.C. 2925.03(C)(3)(b)/(c). The penalties for trafficking in marihuana continue to increase with an increase in the quantity of marihuana sold or offered for sale. R.C. 2925.03(C)(3). At the close of the state's case-in-chief, the evidence introduced, even when viewed in a light most favorable to the State as required by Crim. R. 29(A), does not indicate any instances where defendant sold or offered to sell a controlled substance.[7] Further, there is nothing in the record indicating that defendant knowingly attempted, or solicited, coerced or intimidated another to sell or offer to sell a controlled substance. R.C. 2923.31(I).

The remaining predicate offense, "possession of drugs," states: "[n]o person shall knowingly obtain, possess, or use a controlled substance." R.C. 2925.11(A).[8]

---

**6.** "Drug abuse," the predicate offense upon which the jury was instructed, was no longer an offense at the time of defendant's conduct.

**7.** It should be noted, a *former* version of R.C. 2925.03(A) prohibited the transportation of controlled substances, stating in part, "no person shall knowingly * * * *ship, transport, [or] deliver* * * * a controlled substance, when the offender knows or has reasonable cause to believe the controlled substance is intended for sale or resale by the offender or another." (Emphasis added.) (Former R.C. 2925.03(A)(2), *see* Am. Sub. H.B. 391, effective 7–21–94.) However, this language was deleted from the amended statute, which became effective July 1, 1996. (See, Am. Sub. S.B. 2, effective 7–1–96.) While the indictment does allege a time frame prior to July 1, 1996, the state introduced no evidence whatsoever indicating that the defendant participated in or was associated with the Ramirez drug enterprise until well after July 1, 1996. Were we able somehow to apply this former version of R.C. 2925.03(A)(2) to defendant's case, a proposition for which I find no support in criminal jurisprudence, I would certainly conclude that there is insufficient evidence from which any rational jury could find beyond a reasonable doubt that defendant violated the former version of R.C. 2925.03(A). *Jenks, supra.*

**8.** The jury was instructed that the offense of "drug abuse," formerly codified at R.C. 2925.11(A) could serve as a predicate offense of defendant's corrupt activity. Revised Code

For such offense to constitute a predicate act under the corrupt activities statute, it must be a "felony of the first, second, third, or fourth degree." R.C. 2923.31(I)(2)(c). There is no fourth degree felony offense for possession of marihuana, the controlled substance at issue here. R.C. 2925.11(C)(3). Possession of marihuana is a third degree felony if the offender possesses at least one thousand grams of marihuana. R.C. 2925.11(C)(3)(d). For defendant's conviction to be sustained, there must have been, at the close of the state's case-in-chief, evidence sufficient such that reasonable minds could reach different conclusions as to whether the state proved beyond a reasonable doubt that defendant engaged in a "pattern of corrupt activity." In other words, if the evidence introduced by the state during its case-in-chief was sufficient to support, *inter alia*, the conclusion by a rational trier of fact that defendant participated in two or more trips to Texas and his participation constituted at least two predicate offenses listed in R.C. 2923.31(I)(2), the conviction must be sustained.

I pause here to comment on the evidence introduced concerning the two trips defendant is alleged to have made to Texas. My consideration here is limited, as it must be, to how the evidence appeared to the trial court at the close of the state's case-in-chief.

The record contains significant evidence concerning one trip allegedly made on November 1, 1996. Such evidence includes telephone conversations, a room receipt with Thomas Adkins's signature and Oklahoma address, Thomas Adkins's Oklahoma Driver's License, and a Texas Department of Public Safety traffic warning issued to and signed by Thomas Adkins on November 1, 1996, which listed a license registration number for the Suburban allegedly driven. On direct examination, Jones testified extensively concerning the particulars of this alleged November 1, 1996 trip. To the extent relevant, Jones's testimony corroborated the state's evidence concerning the identity of the individuals in the recorded telephone conversations, the traffic warning, hotel registration, and type of vehicle driven. Jones's testimony on direct and cross examination, coupled with the state's independent evidence, is sufficient to demonstrate that reasonable minds could reach different conclusions as to whether the State proved beyond a reasonable doubt that defendant at least participated in a trip to Texas on November 1, 1996. I reiterate that my consideration here does not concern whether defendant's alleged participation constituted a predicate offense, only whether there was sufficient evidence to establish that defendant somehow participated in the trip. It is not however with the November 1, 1996, trip that I am primarily concerned.

---

section 2925.11 was amended on July 1, 1996 to prohibit possession of drugs. Nevertheless, the essential elements of the two offenses are the same.

The state argues that defendant participated in a second trip to Texas with Jones, alleged by the state to have occurred on November 8, 1996. In support of this theory, the state introduced into evidence an unsigned room receipt from "Best Western" that was recovered from defendant's residence. Defendant's name and an Oklahoma address are mechanically printed on the receipt and the receipt indicates that the purchaser was assigned to room number 238. The state also introduced into evidence a recorded telephone conversation allegedly between Debbie Green and Ramirez, Sr., wherein Green informed Ramirez of the motel name, phone number and room number. The information provide by Green to Ramirez coincides with the information on the Best Western receipt.

On direct examination, Jones did not testify concerning the specifics of the alleged November 8 trip. In fact, Jones's testimony casts significant doubt upon when and whether a second trip involving defendant occurred.

With respect to the number and timing of the trips made to Texas, Jones testified as follows:

"Q. And how many trips did you make?

"A. I made three trips.

" * * *

"Q. On what day did [your mother] pass away?

"A. It was November the 22nd of '96.

"Q. And can you indicate to the ladies and gentlemen in relation to the three trips, when those were in relation to when your mother passed away?

"A. I had made one prior to her passing away around—it was around Halloween time, ladder [sic] part of *October, first of November*. And one after my mother passed away. So it was around the *last week of November*.

"Q. And then you had your *first one*, which was in September or October?

"A. Correct." (Emphasis added.)

It is undisputed that defendant had no involvement with the first one. Jones's testimony concerning the trip taken in "October, first of November" coincides with the state's theory that defendant accompanied Jones to Texas on November 1, 1996.

Jones's testimony concerning the final trip occurring "around the last week of November" however does not coincide with the state's theory that defendant accompanied Jones to Texas on November 8, 1996. That is, the State contends that the second predicate offense occurred when defendant accompanied Jones to Texas on November 8. According to Jones, the second trip taken by he and defendant occurred *after* November 22. A review of the record reveals that

Jones testified on at least six occasions that the alleged second run involving him and defendant occurred after November 22, the approximate date his mother passed away. Jones's testimony is not consistent with a November 8, 1996, trip.

The contradictions between the State's theory and Jones's testimony, although significant are ignored by the majority. Jones's testimony wholly fails to corroborate the state's theory that the second predicate offense occurred on or about November 8. It might be argued that Jones merely got the dates confused. Such an argument however necessarily ignores Jones's conviction concerning when the second trip occurred and would likewise ignore the State's recognition and concession that Jones was in fact planning a trip after his mother's death. During the state's rebuttal case, Wood testified as follows:

"Q. You heard Dennis Jones testify, correct?

"A. That is correct.

"Q. You heard him testify in terms of a trip that was made after his mother passed away, is that correct?

"A. That is correct.

"Q. Were you aware from the wiretap conversations that his mother in fact passed away?

"A. I was, sir.

"Q. Were you ever able to document that trip after his mother passed away that Dennis Jones made?

"A. We were not.

"Q. Can you explain to the ladies and gentlemen why not, if you were unable to document the trip on November the 1st?

"A. The telephone calls that were coming in there towards the end referenced to the loads that were coming back and forth were at one time running into each other. We weren't sure whether we're talking about going or coming. That was one reason.

"Another reason is that that telephone call could have been made from anywhere. It was just no documentation on the telephone line that Jones called from a motel room. There wasn't a call coming in at that time saying I'm in a motel room in Weslaco, Texas. * * *We just didn't know about it. We had no way of knowing. "

It is clear from the state's independent evidence that Jones was planning a trip to Texas sometime after November 22. It is equally clear that the November 8, 1996, taped telephone conversations do not coincide with a trip taken in the latter part of November. The contradictions between Jones's testimony and the state's

theory cannot be dismissed as a mix-up in dates. Consequently, to the extent that Jones testified concerning a second trip taken by him and defendant, that testimony wholly fails to support the state's theory.

Considering this evidence from the state's perspective, the contradictions in the testimony and evidence concerning an alleged second trip are significant in that the only evidence offered by the state that is consistent with its theory was the Best Western receipt and a taped telephone conversation. Even though Jones implicitly denied making a trip with defendant on or about November 8, 1996, the jury was left to infer from this scintilla of evidence not only that Jones and defendant in fact traveled to Texas on November 8, 1996, but that defendant knowingly obtained or possessed at least one thousand grams of marihuana during the trip. Such inferences are impermissible and unsupported by the record herein.

I note that Jones testified consistently with the conclusion I reach here. That is, during his testimony, Jones equivocated as to whether defendant actually went on two trips. To this end Jones stated: "I thought I made two trips with [defendant], I thought." Given that the co-conspirator alleged to have accompanied defendant to Texas was himself uncertain as to how many trips the duo actually made together, a reasonable jury could not reach a conclusion beyond a reasonable doubt that defendant accompanied Jones on two occasions and that defendant intended to possess or obtain the requisite quantity of marihuana during those trips. Consequently, when viewing the evidence in a light most favorable to the state, I believe that reasonable minds could not reach different conclusion as to whether the State proved beyond a reasonable doubt that defendant made a trip to Texas on November 8, 1996.

Assuming *arguendo* that the evidence was sufficient to establish that defendant participated in two trips to Texas, the evidence was nonetheless insufficient to establish that his participation constituted the requisite number of predicate offenses. As discussed above, for defendant's alleged actions to constitute predicate offenses, he must have knowingly obtained or possessed at least one thousand grams of marihuana. R.C. 2925.11. With respect to the quantity of marihuana that must have been present, no marihuana was seized from either of the alleged trips to Texas. There is nothing in the record directly indicating that marihuana was in fact transported during the alleged trips or that a specific quantity of marihuana was transported. Consequently, the evidence introduced here concerning the existence and/or quantity, even when viewed in a light most favorable to the state as required by Crim. R. 29(A), does not indicate any instances where defendant, as a principal offender, actually possessed at least one thousand grams of marihuana. Nor is there evidence in the record indicating that defendant attempted to possess, or solicited, coerced or intimidated another

to possess at least one thousand grams of marihuana. R.C. 2923.31(I). Therefore, when viewing the evidence in a light most favorable to the state, I would hold that reasonable minds could not reach different conclusions as to whether defendant actually possessed at least one thousand grams of marihuana during either the November 1 or November 8 trip.

Assuming *arguendo* that the evidence sufficiently established that defendant made two trips and thereon possessed a controlled substance, the record is devoid of a sufficient quantum of evidence from which a reasonable fact finder could conclude beyond a reasonable doubt that the substance alleged to have been transported was in fact *marihuana*. John Miller, a confessed drug runner for the Ramirez enterprise, testified as follows:

"Q. Mr. Miller, did you have occasion on any of your trips when you returned back to Ohio to be able to buy drugs?

"A. Yes.

"Q. Were those the same drugs that you transported back here to Ohio?

"A. Just marijuana.

"Q. What do you mean by just marijuana?

"A. I never bought no cocaine from him. I bought marijuana from him.

"Q. Were you—let me rephrase that. On trips to Texas and back—and you always bringing marijuana?

"A. As far as I knew.

"Q. *Could you also be bringing other substances ?*

"A. *I could have been, yes. I had no idea.*" (Emphasis added.)

Lucinda Steckley, another confessed drug runner for Ramirez, testified that she made trips to Texas for the purpose of picking up "drugs."

Further, Miller, Jones, and Steckley each testified concerning the method allegedly utilized to load the vehicles in Texas with drugs. Without exception, all three witnesses described a process whereby the drug runners were unable to view what type substance had been loaded or even where in the vehicle the substance was located, however, neither witness offered testimony from which a reasonable inference could be drawn that the substance actually loaded was in fact marihuana as opposed to cocaine or another controlled substance.

The independent evidence offered by the state corroborates the testimony that the Ramirez enterprise was transporting cocaine as well as marihuana and that the alleged drug runners were unaware of which type of drug was in fact being transported during the respective trips. To this end, Wood testified that through

the wiretaps he was able to determine what type of drugs were being transported to Ohio and who was involved in the alleged enterprise:

"Q. What were you able to determine, the type of lingo, or can you explain to the ladies and gentlemen examples of what type of terminology was used during the course of the telephone conversations that you heard through the wiretaps?

"A. I did.

"Q. Please do?

"A. They were using tires, which is a common language to use for either marijuana or cocaine, depends on the amount of tires you're talking about. * * *

"They use green for marijuana, key or kilo for cocaine. White for cocaine. * * *

"* * *

"Q. Now just because someone was mentioned during a telephone conversation, did you consider them involved in the enterprise or the organization itself?

"A. Not if they were just two people talking we didn't. If the language or the conversation was very, again, was easy to understand that they were talking drugs we did. I mean, if they—again, we're talking tires. We knew they were talking marijuana or cocaine, depends on how much they were talking about."

Finally, although not part of the evidence, the prosecutor, in his opening statement, conceded that the alleged Ramirez enterprise was "bringing * * * hundreds of pounds of marijuana and other drugs" into Ohio. The prosecutor's statement is consistent with the evidence indicating that the Ramirez enterprise was not only transporting marijuana into Ohio but was also transporting cocaine and other drugs.

Accordingly, when viewing the evidence in a light most favorable to the state, I believe that reasonable minds could not reach different conclusion as to whether any substance loaded into a vehicle in which defendant was traveling was in fact marijuana; any substance loaded into a vehicle defendant was traveling in was as likely cocaine as it was marijuana.

I pause to comment that by engaging in the above analysis I am only highlighting that the identity of the controlled substance allegedly transported by defendant is significant in that the elements to be proven by the state are in part contingent thereon. As an example, if defendant transported cocaine instead of marijuana, for the alleged trips to constitute predicate offenses, the state would need to prove that the amount of the drug involved exceeded the bulk amount but did not exceed five times the bulk amount. See, R.C. 2925.11(C)(2)(b). Nothing that I have said should be construed to suggest that when the identity of a substance is not ascertainable, a defendant cannot be convicted of engaging in

criminal activity. There are clearly other theories under which a prosecutor may proceed in such a situation. But when a prosecutor elects to proceed against a criminal defendant pursuant to a statute that requires as one of its essential elements proof of a specific controlled substance, evidence of the presence, existence, quantity, etc., of that specific controlled substance must be sufficient to support the conviction. Absent such evidence, a conviction therefor cannot be sustained.

Assuming *arguendo* that the alleged two trips and the existence and quantity of marihuana necessary to constitute predicate offenses were sufficiently proven, evidence concerning the presence of the requisite mental state was nonetheless insufficient. That is, when charged as a principle offender, defendant must have knowingly possessed or obtained the requisite quantity of marihuana. Although Jones testified that during the November 1 trip he and defendant *discussed* their drug smuggling effort and defendant acted as if he knew they were transporting drugs to Ohio, Jones described a method of operation that prevented either Jones or defendant from ever observing or even knowing the location of any drugs allegedly transported during their trips. In fact, Jones testified that both he and defendant believed that any drugs they were smuggling were located in the vehicle's headliner:

"Well, it come up that we were smuggling drugs, and we was kind of joking around where could it be. And Mr. Adkins says, well, I know where it's at. And he tipped the head of the headliner. He said it's up here. And I kind of agreed at that time, but I had no idea where it was at that time."

Previously in his testimony, Jones was asked the following:

"Prosecutor: What was your purpose in taking the suburban to Texas?

"Jones: To bring back drugs to Ohio.

"Prosecutor: Was this discussed between you and Thomas Adkins on the way down?

"Jones: It was as far as, you know, saying yeah, that's what we was going for. It was—we talked about it a little bit, yeah.

"* * *

"Prosecutor: From your conversation with Tom Adkins on the way down, and your discussion about drugs, were you aware that Tom Adkins *knew what you was going to Texas for*?

"Jones: I'm pretty sure he did." (Emphasis added.)

Absent from the record herein is any evidence bearing directly on defendant's intent, knowledge, etc., during the alleged second trip.

Although Jones's testimony, if believed, indicates that defendant made one trip with Jones to Texas in early November *knowing* that Jones planned to pick up marihuana in Texas, *knowing* that another plans to engage in criminal conduct is not equivalent to intending to engage in the same criminal conduct. Therefore, when viewing the evidence in a light most favorable to the state, I believe that reasonable minds could not reach different conclusions as to whether defendant knowingly possessed or obtained a sufficient quantity of marihuana on two occasions.

I recognize that the corrupt activity statute provides that a *conspiracy* to engage in conduct amounting to a predicate offense could serve as an instance of one's pattern of corrupt activity. R.C. 2923.31(I)(2)(c). Conspiracy is punished as a "misdemeanor of the first degree, when the most serious offense that is the object of the conspiracy is a felony of the fifth degree." R.C. 2923.01(J)(4). Conspiracy is not punished as a felony until "the most serious offense that is the object of the conspiracy" is at least a fourth degree felony. R.C. 2923.01(J)(2).

Conspiracy to engage in possession of marihuana, for purposes of engaging in a pattern of corrupt activity, must have as the object of the conspiracy, possession of at least one thousand grams of marihuana to constitute a felony offense. R.C. 2923.01(J)(2); 2925.11(C)(3)(d) and 2923.31(I)(2)(c). Therefore, because at least one of the predicate acts constituting the pattern of corrupt activity must be a felony, evidence that defendant conspired to engage in possession of marihuana in the amount of at least one thousand grams is necessary to survive a Crim. R. 29 motion. Also required is evidence that the proceeds of the violation or combined violations amounted to at least $500. R.C. 2923.31(I)(2)(c).

The conspiracy statute provides:

"(A) No person, with purpose to commit or to promote or facilitate the commission of * * * a felony drug trafficking, manufacturing, processing, or possession offense* * *shall do either of the following:

"(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;

"(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.

"(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

"* * *

"(F) A person who conspires to commit more than one offense is guilty of only one conspiracy, when the offenses are the object of the same agreement or continuous conspiratorial relationship.

"* * *

"(H)(1) No person shall be convicted of conspiracy upon the testimony of a person with whom the defendant conspired, unsupported by other evidence." R.C. 2923.01.

The Revised Code provides that "[n]o person shall be convicted of conspiracy upon the testimony of a person with whom the defendant conspired, *unsupported by other evidence.*" (Emphasis added.) R.C. 2923.01(H)(1). As I illustrated above, there is insufficient evidence present in this record regarding defendant's purpose in traveling to Texas with Jones other than Jones's testimony regarding their conversation. Even if Jones's testimony were sufficient, and assuming that defendant actually made two trips to Texas, his testimony again indicates only that defendant made the trips with Jones *knowing* that Jones planned to pick up marihuana in Texas and return it to Ohio. R.C. 2923.31(I)(2). *Knowing* that another plans to engage in criminal conduct is not the same as agreeing to participate in that criminal conduct with the purpose of committing, promoting, or facilitating the commission of a prescribed criminal act. R.C. 2923.01(A)(2). Therefore, I would hold that reasonable minds could not conclude beyond a reasonable doubt that defendant, with purpose to commit or promote possession of drugs, agreed to possess or obtain, or promote or facilitate another in possessing or obtaining at least one thousand grams of marihuana during either the November 1 or November 8 trips.

Whether proceeding under a principle or conspirator theory, the majority holds that inferences concerning the existence and quantity of marihuana and defendant's knowledge thereof may be indulged in the absence of, *inter alia,* any marihuana being seized from either of the trips. I believe such inferences are unsupported by the record and are therefore unreasonable and impermissible.

Assuming again that defendant made two trips to Texas with Jones, the syllogism advanced by the majority is apparently as follows: because (1) the method of interaction with Pato, (2) the same license plate number and same suburban were identified as being driven on both trips, (3) ninety-five pounds of marihuana was found in the gas tank of that same suburban after Debbie Green and Lucinda Stuckey made a trip unrelated to defendant, (4) defendant and Jones received money for each alleged trip and Jones and defendant split the balance of the expense money not used during the trips, and (5) there was testimony concerning the street value of marihuana in northwest Ohio, a reasonable jury could infer beyond a reasonable doubt that defendant, on the two alleged occasions, in fact possessed or obtained marihuana, presumably being contained

in the gas tank, or conspired to do the same, and that on at least one occasion the quantity of marihuana inferred was in excess of one thousand grams.

Again, the inferences advanced by the majority are not supported by the record and are in my opinion unreasonable. The mere presence of defendant in a vehicle that may have been modified for purposes of concealing and transporting drugs from Texas to Ohio is insufficient to permit the jury to reasonably infer beyond a reasonable doubt that defendant intended to travel to Texas for the *purpose* of possessing or obtaining at least one thousand grams of marihuana. *See, e.g. State v. Marian* (1980), 62 Ohio St.2d 250, 16 O.O.3d 284, 405 N.E.2d 267; *see also*, R.C. 2923.01(A); 2925.11(A)/(C)(3)(d) and 2925.03(C)(3)(c). Likewise, recovery of marihuana from the same vehicle after a run entirely unrelated to defendant and the alleged payments to defendant for accompanying Jones to Texas is insufficient evidence upon which to base an inference that defendant possessed or obtained a sufficient quantity of marihuana on those two occasions. The inferences indulged by the majority are too tenuous.

In sum, because as a matter of law there was insufficient evidence introduced at trial indicating that defendant made a second trip to Texas on November 8, 1996, that during the alleged trips he actually possessed or conspired to possess at least one thousand grams of marihuana, that the substance alleged to have been transported during the trips was in fact marihuana, and that defendant possessed the requisite mental state, defendant–appellant's first assignment of error should be sustained.